BLOOMINGDALE BROS. ET AL v. UNITED STATES (No. 1838).[1]

1. CURLING IRONS.
    Curling irons are not classifiable as "nippers and pliers" under paragraph 166, tariff act of 1913, but as articles in chief value of metal under paragraph 167.

2. JEWELRY—ARTICLES OF PERSONAL ADORNMENT.
    While the popular conception of jewelry necessarily implies an article of personal adornment. it does not imply that all articles of personal adornment are jewelry.— American Bead Co. v. United States (7 Ct. Cust. Appls., 18; T. D. 36259).

3. IMITATION JET AND BASE-METAL ARTICLES OF PERSONAL ADORNMENT.

Articles of personal adornment composed of imitation jet and base metal are not regarded by people in general as jewelry, and are not classifiable as "jewelry, commonly * * * so known," under paragraph 356, tariff a ct of 1913.

4. EVIDENCE– JUDICIAL NOTICE.

The court judicially knows that common black iron hairpins, plain bone, celluloid, or gallilith women's side and back combs, and vinaigrette bottles with metal trimmings, memorandum pads with metal backs, ordinary cigarette cases, match boxes, and similar articles designed to be carried in the pocket or hand bag for utilitarian purposes only and not for wear or as part of the attire are in no sense articles of personal adornment.

5. "JEWELRY, * * * COMMERCIALLY SO KNOWN."

The evidence adduced in support of a claim that certain articles, not *commonly* known as jewelry, were *commercially* so known, being confusing, conflicting, and irreconcilable, the common meaning must prevail.

6. BROOCHES, PENDANTS, BRACELETS, COMBS, HATPINS, AND HAIRPINS OF METAL AND PASTE.

Brooches, pendants, bracelets, combs, hatpins, and hairpins, composed of metal and paste, paste chief value, are classifiable as manufactures in chief value of paste under paragraph 95, tariff act of 1913, and not as jewelry under paragraph 356.

7. NECKLACES OF PASTE BEADS.

Necklaces in chief value of paste beads are not classifiable as jewelry, under paragraph 356, tariff act of 1913, but as manufactures in chief value of paste beads under paragraph 333.

## United States Court of Customs Appeals, March 20, 1918.

APPEAL from Board of United States General Appraisers, G. A. 3038 (T. D. 37072).

[Reversed.]

*Comstock & Washburn* (*Albert H. Washburn* and *Henry J. Rode* of counsel) for appellants.

*Bert Hanson*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

[Oral argument Feb. 12, 1918, by Mr. Washburn and Mr. Lawrence.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Brooches, necklaces, pendants, bracelets, combs, hatpins, and hairpins composed of metal and paste, paste being the component of chief value, were classified by the collector of customs at the port of New York as jewelry and were assessed for duty at the rate of 60 per cent ad valorem under that part of paragraph 356 of the tariff act of 1913 which reads as follows:

356. Jewelry, commonly or commercially so known, valued above 20 cents per dozen pieces, 60 per cent ad valorem; * * *.

Curling irons imported with the above described wares were classified by the collector as "nippers and pliers" and assessed for duty at 30 per cent ad valorem under the provisions of paragraph 166 of the tariff act of 1913, which paragraph reads as follows:

166. Nippers and pliers of all kinds wholly or partly manufactured, 30 per cent ad valorem.

The importers protested that the several articles of metal and paste were not jewelry and claimed that the goods were dutiable under various paragraphs of the tariff act other than the provision under which they were assessed. The claim upon which the importers relied, however, was that the goods were either manufactures in chief value of glass or paste dutiable at 30 per cent ad valorem under paragraph 95 or that they were manufactures of beads dutiable at 50 per cent ad valorem under paragraph 333 of the tariff act of 1913. Paragraphs 95 and 333, so far as they are pertinent to the protests, are as follows:

95. * * * All glass or manufactures of glass or paste or of which glass or paste is the component material of chief value, not specially provided for in this section, 30 per cent ad valorem.

333. * * * Curtains, and other articles not embroidered nor appliquéd and not specially provided for in this section, composed wholly or in chief value of beads or spangles made of glass or paste, gelatin, metal, or other material, 50 per cent ad valorem.

The importers further protested that the curling irons were not nippers or pliers, but that they were articles of metal not specially provided for and dutiable at 20 per cent ad valorem under that part of paragraph 167 of the tariff act of 1913 which reads as follows:

167. Articles or wares not specially provided for in this section; * * * if composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal * * * and whether partly or wholly manufactured, 20 per cent ad valorem.

The Board of General Appraisers affirmed the collector's classification as to all the goods and overruled the protests. The importers appealed.

The Government admits that the curling irons should have been assessed for duty at 20 per cent ad valorem as articles of metal under paragraph 167, and therefore as to that item we must hold that the protest should have been sustained.

The brooches, bracelets, hatpins, hairpins, and combs are composed of black glass paste, fastened by some adhesive material to an iron frame or support coated black. The pendants are faceted pieces of black glass paste fitted with a black metal loop, and the necklaces are composed of black glass paste beads and bead ellipsoids strung on a string furnished with a black clasp. All of these wares were reported by the appraiser to be articles of personal adornment valued at more than 20 cents per dozen pieces, and composed of metal set with glass paste or imitation jet, glass paste being the component of chief value.

To bring the goods within the classification made by the collector they must be either commonly or commercially known as jewelry. If they are popularly so regarded, or if at or prior to the passage of the tariff act of 1913 they were definitely, uniformly, and generally

and not partially, locally, or personally bought and sold by the wholesale trade of the country as jewelry, then they were properly assessed for duty at 60 per cent ad valorem under the first clause of paragraph 356. If, however, the wares under discussion are not jewelry as that term is popularly understood, then it was incumbent on the Government to establish affirmatively by evidence that on and immediately prior to the 3d of October, 1913, the goods were definitely, generally, and uniformly known to the trade as jewelry, and if that fact was not proven, the protests should have been sustained.

The questions to be determined therefore are, first, Did people in general at the time of importation regard the merchandise now under discussion as jewelry? and, second, If it was not so regarded by people in general, has the Government adequately proven that at and immediately prior to the passage of the tariff act of 1913 the common meaning of the word "jewelry" had been so enlarged by the trade as to include the goods now under discussion?

Paragraph 434 of the tariff act of 1897 provided in terms for "articles commonly known as jewelry." The same act provided for manufactures of jet in paragraph 115 and for manufactures of glass or paste in paragraph 112. The jewelry paragraph, it will be noted, covered only such jewelry as fell within the common acceptation of the term and the provision was so worded as to exclude all articles commercially but not popularly recognized as jewelry. Hatpins, hairpins, breastpins, buckles, and "other similar ornaments adapted for personal adornment" set with black glass to resemble jet, imported under the tariff act just referred to, were classified by the collector under paragraph 434 thereof, but as that classification was rejected on appeal to the Circuit Court for the Southern District of New York, the rejection must be accepted as a judicial determination that such ornaments were not commonly known as jewelry. A. Bader & Co. *v.* United States (116 Fed., 541).

The Treasury Department acquiesced in that decision—G. A. 5624 (T. D. 25152), G. A. 6374 (T. D. 27382)—and the collector then sought to classify ornaments composed of metal and imitation jet as manufactures of "colored glass." (T. D. 27382.) Three years after the final decision of the Bader case, the Circuit Court of Appeals for the Second Circuit reaffirmed the doctrine that ornaments made of metal set with imitation jet were not commonly known as jewelry. United States *v.* S. Schiff & Co. (139 Fed., 549).

The tariff legislation from 1846 to 1890 on the subject of jewelry and jet and imitation jet articles was carefully reviewed in United States *v.* Beierle, in which case De Vries, Judge, speaking for this court, pointed out that for a period of 44 years jewelry and jet and imitation jet articles had been regarded by Congress as separate and

distinct tariff articles and that the courts had definitely decided under that legislation that jet and imitation jet ornaments were not commonly known as jewelry. The record in that appeal disclosed no evidence of commercial designation, and it was there held that barettes used for personal adornment and composed of base metal set with imitation jet were not jewelry and were not dutiable under paragraph 448 of the tariff act of 1909, which subjected to a duty of 60 per cent ad valorem "all articles commonly or commercially known as jewelry." United States v. Beierle (1 Ct. Cust. Appls., 457; T. D. 31506).

In American Bead Co. v. United States we decided that necklaces composed of imitation jet beads and base-metal clasps were not commonly known as jewelry and that while the popular conception of jewelry necessarily implied an article of personal adornment, it did not imply that all articles of personal adornment were jewelry. In that case no evidence of commercial designation was submitted, and this court declined to sustain the collector's assessment of the necklaces under paragraph 356 of the present act as "jewelry, commonly or commercially so known." American Bead Co. v. United States (7 Ct. Cust. Appls., 18–27; T. D. 36259).

In our opinion the decisions hereinbefore cited conclusively settle that articles composed of imitation jet and base metal are not regarded by people in general as jewelry and we must therefore rule that none of the merchandise now under discussion is within that part of paragraph 356 which provides for articles commonly known as jewelry.

We now come to the question of whether such articles are commercially known as jewelry and consequently to a consideration of the testimony offered by the Government in support of its contention that they were at the time the tariff act now in force was passed, definitely, uniformly, and generally regarded by the trade as jewelry.

In brief the testimony submitted to the board as to commercial designation was as follows:

J. B. Haskin, who had had 21 years' experience in selling jewelry to the wholesale and retail trade for manufacturers and importers, testified that he had dealt in and manufactured jet and mourning jewelry for eight years prior to the hearing before the board; that merchandise of the kind imported came within the trade understanding of "jewelry." Speaking of the pendants, he said they might be used for various other things besides jewelry. On cross-examination he testified that in the trade *not all articles of personal adornment were jewelry, but* that anything made into a brooch with pin and joint was jewelry; that all necklaces if fitted with a clasp were jewelry, though such necklaces were made of seeds or shells; that all bracelets and hatpins entirely of iron, and hairpins and combs of

bone, celluloid, or of *any material,* no matter how cheap they were and whether or not ornamented with precious or imitation stones, were also jewelry to the trade.

William Levy testified that he was a jewelry salesman; that he came in contact with the wholesale jewelry trade throughout the United States; that he was familiar with the trade understanding of the term "jewelry," and that so far as his experience went the trade meaning of "jewelry" had always been the same. He stated that the firm with which he was connected manufactured brooches, bracelets, and pendants of imitation jet, but that the firm did not make either neck chains or combs of that material. He declared that brooches, bracelets, and pendants of imitation jet were classified by the trade as jewelry, *because they were used for personal adornment.* In his opinion jewelry *necessarily implied articles of personal adornment,* but from that it did not follow that *all articles of personal adornment were necessarily jewelry.* He said that jewelry was made of precious or semiprecious metals, either plain or set with precious or semiprecious stones, and that in the trade articles set with imitation jet or imitations of other stones were jewelry. On cross-examination he repeated that jewelry must be made of precious or semiprecious metals either plain or set with precious or semiprecious stones or imitations thereof, but that any necklace having a metal clasp was jewelry even if the necklace were made of shells or seeds. He classified as semiprecious metals, "copper, copper alloys, common mixtures of copper, brass, German silver, aluminum, and steel and its compounds, such as iron." Although he did not handle genuine jet goods and did not know what real jet was, he regarded real jet as a precious stone. He said that he dealt in and was familiar with imitation jet articles, and that imitation jet was, in his opinion, a semiprecious stone. He declared that any hatpin with a head was jewelry, whether the head was of glass or of metal and *whether the use of the hatpin was ornamental or otherwise.*

I. C. Jones testified that he had been a jewelry salesman for a period of about 14 years prior to the hearing, and that he sold jewelry in wholesale quantities to retail dealers, and that jewelry, as he understood it, was a personal ornament or adornment made of precious or semiprecious stones, or semiprecious or base metals, or of imitations thereof, or of any combination of such materials. On cross-examination he stated that articles of personal adornment made of base metals would be jewelry if made "in imitation of the real," and that a steel or iron comb would be jewelry if manufactured in imitation of jet or something else. He declared that a comb or hairpin wholly of base metal and ornamental in form would be jewelry. He said that all necklaces in imitation of real jewelry came within the trade conception of jewelry, *but that necklaces of shells were not so regarded.*

As he understood the commercial meaning of the term, all hatpins with black glass heads and *all mourning pins with heads of imitation jet, and whether large or small, were jewelry.*

Abram H. Lowenthal, a wholesale jeweler with an experience of 25 years in the business, testified that his understanding of jewelry was a personal adornment made of base metal and precious or semiprecious stones, and that anything with a catch or pin used as an ornament for ladies' or gentlemen's wear was jewelry. In his opinion all the official exhibits were jewelry. He stated that combs of base metal, even if made of tin, would be jewelry if they were articles of personal adornment.

Ralph W. Wilson, a salesman for Theodore W. Foster Co., manufacturing jewelers, testified that the term "jewelry" had a well-understood meaning throughout the trade; that his firm did not sell imitation jet bracelets, neckchains, or combs, but that as to the other articles involved in the case he could say they were classified by the trade as jewelry. He declared that a mourning pin or any pin, whether large or small, having an imitation jet head, was jewelry. He said that the goods manufactured by his firm were better than those in controversy, because the former were not japanned on the back, but mounted on gold-filled mountings, and were in fact high-grade goods.

Max J. Stein testified that he had been in the jewelry business for 26 years and that for 16 years of that time he had been engaged in selling jewelry to wholesale dealers. He said that all of the official exhibits would be designated by the trade as jewelry; that jewelry in the trade meant an article of personal adornment made of either precious or base metal or of precious, semiprecious, or imitation stones. He further stated that the combs, necklaces, and bracelets in issue were all jewelry because they were made in imitation of jet or onyx and were articles of personal adornment. On cross-examination he testified that jewelry was an article made of precious or base metal, plain or set with precious, semiprecious, or imitation stones and used for personal adornment. He said that iron bracelets, hatpins and hairpins of base metal and necklaces and combs of whatever material made were jewelry if used for personal adornment.

E. E. Baker, a salesman for E. L. Spencer Co., manufacturing jewelers, testified that he had been in the jewelry business for 18 years and that for 8 years preceding the hearing he had sold jewelry to wholesale dealers exclusively. He said that as understood by the wholesale trade any article of personal adornment, either made wholly or in part of metal, whether ornamented or not with stones or made wholly of real or imitation stones, was jewelry. In his opinion an article of iron worn by a savage as an ornament, *necklaces of seeds or shells, vinaigrette bottles with metal trimmings, memorandum pads*

*with metal covers*, and mesh bags, more or less decorative in character, were all classified by the trade as jewelry.

A. R. Hilsenger, salesman for eight years with Williams & Payton, wholesale dealers in jewelry, testified that all of the official exhibits were included by the trade in the term "jewelry"; that jewelry in the trade was a *fancy article worn as an ornament as an addition to a woman's dress to add to her appearance;* that jewelry was "sometimes made of all metal, semiprecious stones, with or without stones, with the joint and catch attachment for brooches, with a long stem for hatpins, with a chain connection for pendants." He classified as trade jewelry vanity cases, cigarette cases, mesh bags, shell and seed necklaces, back combs of white metal and of various metal compositions, *shoe buckles of black metal,* and hatpins with black glass heads. He said, however, that *mourning pins with black glass heads were much shorter than hatpins with black glass heads and were not jewelry because of their length.* He stated in effect that the size of pins with black glass heads determined their classification.

Harry Wachenheimer, a manufacturing jeweler engaged for 13 years in the business of selling jewelry at wholesale, defined commercial jewelry as *any article either made wholly or partly of metal and precious or imitation precious stones or made entirely of precious stones without metal.* He said that all of the exhibits were jewelry under that definition with the exception of the pendant, which was a trimming; he remarked that such pendants were also used in the making of earrings and that earrings were jewelry. On cross-examination he stated that any article of adornment sold in the jewelry business was called jewelry. He classified vanity cases, powder cases, stamp cases, mesh bags, match boxes, and coin holders as jewelry. He also said that shoe buckles of iron, if at all decorated, and a ladies' back comb of any kind for the hair, even if absolutely plain and made of celluloid, would be jewelry, although an *ordinary hairpin made of celluloid was not jewelry.*

T. O. MacDonald, a wholesale salesman of jewelry for the manufacturer, testified that he had been dealing with the wholesale jewelry trade for 18 years and that all of the official exhibits were regarded by the trade as jewelry; that in the trade any article having a joint or catch for use as a pin, an ornament with a long pin for use as a hatpin, as well as any article composed of metal with enamel on it, was jewelry. He asserted that the wholesale trade made no distinction between articles set with jet and articles set with other stones and that both classes were covered by the term "jewelry" in the trade. On cross-examination the witness stated that *any kind of metal article, whether trimmed or untrimmed with stones, ornamental, or only utilitarian was jewelry in the trade;* that any hatpin with a black glass head, however plain, made of imitation jet was jewelry and *that even a pin mounted with a round glass bottle, if used as a hatpin, would be*

jewelry. *A small black pin made of the same material as a hatpin and differing from the latter in size only would not be classified by the trade as jewelry because the smaller pins were not used as ornaments. The smaller pins, however, if used as lace pins, cuff pins or collar pins, would be jewelry.* He also said that match cases, mesh bags, vanity cases, cigarette cases, powder cases, stamp cases, and coin holders have been regarded by the trade as jewelry for a period of 25 years. *In his opinion, the common understanding of the term "jewelry" accorded with the trade understanding.* In answer to General Appraiser McClelland, *the witness said that the one attribute of adornment was sufficient to classify each of the exhibits as jewelry if made of metal and whether plain or not.*

K. W. Ulzhoefer, engaged in the business of selling jewelry for seven years, testified that all of the exhibits with the possible exception of the pendants were commercially regarded as jewelry; that all articles of adornment made of precious, semiprecious, or base metal and having a joint attached were jewelry. On cross-examination the witness stated that match cases, coin holders, mesh bags, powder cases, stamp cases, vanity cases, and shoe buckles were jewelry; that a woman's back or side comb of any kind was jewelry even if perfectly plain and made wholly of gallilith. He also asserted that an article might be jewelry *though it be useful and not ornamental* and that *the common and trade understanding of jewelry were in accord.* In response to General Appraiser McClelland, the witness reiterated that a *woman's perfectly plain side comb made of gallilith was jewelry and that he regarded such a comb as an article of adornment.*

A careful analysis of this testimony discloses that the trade definitions of jewelry given by the witnesses for the Government do not agree and that many of the witnesses identified as jewelry articles which did not at all conform to the requirements of their own definitions. We realize, of course, that to describe a thing or class of things so as to separate that thing or class from all others and to enumerate its characteristics and essential qualities in such a way that it will include that class or thing and nothing else is extremely difficult, so difficult in fact that the experienced lexicographer not infrequently proves unequal to the task. But conceding that a person may be perfectly able to identify a thing and yet find himself utterly unable to precisely describe it, we can not overlook the fact that some of the Government's witnesses identified as jewelry in the trade articles which other Government witnesses, having an equal opportunity to know just as positively, excluded from that category. That difference in classification extended to several articles of common knowledge and every day use concerning which the trade should have been in accord. Such a variance in classification,

coupled with pronounced differences of definition, deprives the testimony of its value as evidence of commercial designation inasmuch as it leaves the mind wholly unsatisfied that the trade understanding of "jewelry," so far as it differed from the common meaning of the term, had sufficiently crystallized to be definite, uniform, or general. That view is further strengthened by the fact that several of the wit nesses classified as "jewelry" things which we are quite sure are not uniformly or generally so regarded by those who buy and sell them at wholesale, whatever may be the local, personal or individual practice. Precisely how far the popular acceptation of the term "jewelry" may have been extended or restricted by the trade, is not, of course, within our judicial knowledge and whether a given article is or is not jewelry we may not be able to say without the aid of competent evidence. The evidence in this case, however, shows very clearly that while jewelry may be both useful and ornamental, part of the trade at least considers that personal adornment is an essential characteristic of all jewelry and we can and do know that common black iron hairpins, plain bone, celluloid, or gallilith, women's side and back combs, and vinaigrette bottles with metal trimmings, memorandum pads with metal backs, ordinary cigarette cases, stamp cases, match boxes and similar articles, designed to be carried in the pocket or hand bag for utilitarian purposes only and not for wear or as part of the attire, are in no sense articles of personal adornment. Consequently we may well say that such things are not uniformly or generally recognized by the trade as jewelry.

Giving all of the witnesses credit for good faith, the best that can be said of their testimony is that it is confusing, conflicting, and irreconcilable and not at all convincing that the commerce of the country at the time of importation of the goods in issue had given to "jewelry" a definite, uniform, or general meaning different from its common signification. We must therefore hold that commercial designation has not been satisfactorily established and because of that holding and of the popular understanding of "jewelry," we must decline to sustain the board's finding that the merchandise in controversy is either commonly or commercially known as jewelry.

The curling irons should be classified as articles of metal, dutiable at 20 per cent ad valorem under paragraph 167.

The brooches, pendants, bracelets, combs, hatpins, and hairpins composed of metal and paste, the latter being the component of chief value, are manufactures in chief value of paste and dutiable at 30 per cent ad valorem under paragraph 95.

The bead necklaces, paste beads being the component of chief value, are articles composed in chief value of beads made of paste and are dutiable at 50 per cent ad valorem under paragraph 333.

The decision of the Board of General Appraisers is *reversed*.