(C. D. 444)

J. F. STARKEY & Co. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 4, 1941)

Strauss & Hedges (Eugene F. Blauvelt of counsel) for the plaintiffs.
Webster J. Oliver, Assistant Attorney General (Joseph F. Donohue and Alfred A. Taylor, Jr., special attorneys), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

KEEFE, Judge: In these suits the plaintiffs seek to recover certain customs duties alleged to have been illegally assessed by the collector at New York upon merchandise invoiced as amorphous plumbago dust or carbon dust. Duty was assessed thereon at the rate of 30 per centum ad valorem under paragraph 213 of the Tariff Act of 1930, as crystalline dust graphite. The plaintiffs claim that the merchandise is properly dutiable under the same paragraph at 10 per centum ad valorem as amorphous graphite or plumbago.

The paragraph of the Tariff Act of 1930 under consideration provides as follows:

PAR. 213. Graphite or plumbago, crude or refined: Amorphous, 10 per centum ad valorem; crystalline lump, chip, or dust, 30 per centum ad valorem; crystalline flake, $1\frac{65}{100}$ cents per pound. As used in this paragraph, the term "crystalline flake" means graphite or plumbago which occurs disseminated as a relatively thin flake throughout its containing rock, decomposed or not, and which may be or has been separated therefrom by ordinary crushing, pulverizing, screening, or mechanical concentration process, such flake being made up of a number of parallel laminae, which may be separated by mechanical means.

At the trial counsel for the plaintiffs admitted that the graphite in question had a crystalline structure but introduced the testimony of seven witnesses to establish that in the trade and commerce of the United States the commercial meanings of the terms "crystalline" or "amorphous," when applied to graphite or plumbago, were uniformly, definitely, and generally different from their common or scientific meanings.

The witnesses testified that the terms "crystalline" and "amorphous," when applied to graphite, were well known in the trade and commerce of the United States at and before the time of the adoption by Congress of the Tariff Act of June 17, 1930. These witnesses included the principal importers and commercial grinders of graphite in the United States, three of whom were constantly buying and selling the same at wholesale, and four were buying at wholesale for their own use. Although two buyers were not experienced in handling crystalline graphite, we are of the opinion that their commercial knowledge of graphite was sufficient to enable them to testify as to the difference between the two types.

From such testimony it was established that the wholesale trade for graphite was confined to parts of the United States located east of the Mississippi River and north of the Mason and Dixon Line and upon the Pacific coast and that the grinders located in such territory are the only purchasers of crude graphite in the United States. In such trade the general understanding of the terms "crystalline" and "amorphous" differed from the common or dictionary meaning, to wit, crystalline graphite embraced a graphite that was tough and elastic in density; that such characteristic caused it to remain in its flake form and prevented it from easily breaking down into a powder under ordinary commercial grinding methods, while, on the other hand, amorphous graphite is known by the trade as a graphite which under ordinary grinding conditions could readily be reduced into a powder.

Plaintiffs' witnesses further testified that it was customary in the graphite trade to order by sample standards, or by manufacturers' standards, which would not ordinarily include the term "crystalline" or "amorphous"; that, however, such terms were generally understood by the grinders and refiners of graphite and they knew that the article they were to receive was either crystalline graphite or amorphous graphite as the case may be, and that the seller's personal designation of the article indicated which type of graphite was offered and the buyer knew by such specifications what they were receiving without the use of the term "crystalline" or "amorphous." Two witnesses, however, testified that they had purchased graphite under the name of "amorphous."

It was further established that some grinders of graphite have use for crystalline graphite only, known in the trade as "crucible" graphite; that such graphite is utilized for the manufacture of crucibles necessary in the steel industry. Other grinders handle the amorphous type exclusively, which is used in manufacturing foundry facings, lubricants, and paints, or for any product where a type of graphite readily reducible to a powder is desired. Therefore the crystalline and the amorphous types of graphite are used in two distinct trades. As the amorphous graphite is entirely unsuited for use in the crucible trade, the name "crucible" is commonly applied to the crystalline graphite used therein. However, crystalline graphite may be used in industries purchasing amorphous graphite but it is not practicable nor desirable for use therein because of its characteristic of flattening out into a flake rather than readily changing its form to that of a powder; and that the extra time and cost of grinding crystalline graphite to a powder is prohibitive of such use.

The witnesses for plaintiffs were all agreed that amorphous graphite contains crystals. One witness with 25 years' experience in the graphite trade testified that he had never seen an amorphous graphite free from a crystalline structure.

Some of the witnesses subjected the samples of the imported merchandise to the usual laboratory tests ordinarily applied to graphite in the usual course of business and, as a result of such tests, concluded that all of the merchandise was, within their knowledge and experience, the amorphous graphite of commerce. Other witnesses, through a mere inspection of the samples, were of the opinion that the merchandise was within the class known to them as amorphous graphite. The samples were further tested by crushing with a small hammer and the result was found to be a fine powder. The witness making such test testified that if the graphite flattens out without forming a powder it shows a structure necessary in the manufacture of crucibles. If, however, the result is a powder, it is unsuited for such use because it possesses a weakness in structure and shape, and that such graphite is known as "amorphous" in the trade.

One of the witnesses made grinding tests of the merchandise represented by exhibits 1 to 5, inclusive. The results of such tests were admitted in evidence as illustrative exhibit G. The graphite was ground for 12 hours, and the exhibit shows that it is in the form of a very fine powder. The same witness also tested a sample of crystalline graphite, submitting it to a 12-hour grinding period as well as to 36 hours of grinding. After grinding 12 hours, the graphite was in the form of small grains, rather flat in appearance. After 36 hours, there appeared to be some dust, but the sample also contained numerous flat pieces of graphite, thus demonstrating that it retained its

original form as shown in illustrative exhibit H. Illustrative exhibits A and B were admitted in evidence as illustrating the crude crystalline and crude amorphous graphite as taken from the mines. Illustrative exhibit A represented a large lump of graphite taken from the same mine in Ceylon as the graphite under consideration. Illustrative exhibit B represented a large piece of crystalline graphite taken from a crystalline graphite mine in Ceylon. When personally making tests of these two types of graphite by hammering a portion of each between two paperweights, the writer hereof found that exhibit A readily ground into a powder while exhibit B merely flattened out without producing any powdered substance.

The Government introduced the testimony of four witnesses. Doctor Kerr, Associate Professor of Mineralogy at Columbia University, testified that he had examined the five samples of the importation with a hand lens and under a microscope, finding as a result thereof that the samples were composed of aggregates of small flakes, the flakes building up in accordion-like manner to form small lumps of flakes; that after grinding the samples in a mortar the flakes would become smaller and smaller but still retain their flake-like characteristics and that the lumps would become broken down into their component crystals; that although to the naked eye the material would appear to be a fine black powder, under a microscope their crystal characteristics still prevailed. From such examination he determined that the samples were within the geological characteristics of crystalline graphite. The witness further testified that ordinarily when, with the eye or with the aid of a small lens, individual crystals may be distinguished, the material would be termed crystalline graphite, but if the individual crystals cannot be so distinguished, other terms of description are used, such as "amorphous," but personally he would use the term "crypto crystals" to designate the very fine characteristics of the material.

Another witness testified that he represented the foreign exporters of Korean amorphous graphite; that he sells such graphite to the trade under the term "amorphous"; that his understanding of amorphous graphite is a substance distinctly different from a crystalline graphite as shown by the shape of the material itself, inasmuch as it has no crystalline appearance apparent to the eye; and that amorphous graphite does not have a distinctive crystalline nature. The witness admitted he had not had any experience with any form of graphite except the Korean amorphous which his principals forwarded to him. When shown illustrative exhibits A and B, he identified exhibit A as Ceylon crystalline graphite and exhibit B as amorphous in structure, whereas exhibit B is a crystalline lump and exhibit A the amorphous. Although he was of the opinion that the merchandise herein was the crystalline graphite of commerce, we do not attach much weight to

such opinion evidence in view of his inexperience in handling graphite generally.

The remaining Government witnesses were inexperienced in the wholesale graphite trade, dealing in processed materials only. Their testimony, in our opinion, has no bearing upon the question now before us.

The plaintiffs, while admitting that the merchandise herein has a crystalline structure, contend that, in the commercial understanding of the term "crystalline graphite," the same would be excluded, and that there is a commercial understanding of the term "amorphous graphite" which would include the imported merchandise. The plaintiffs further contend that Congress recognized that the common definitions of the descriptive terms as applied to graphite were not the definitions thereof as known in the wholesale graphite trade in the United States, and that Congress intended the commercial meaning of those terms to govern the classification.

The Government contends that even though each of the plaintiffs' witnesses testified as to the trade understanding of the terms in controversy, it was admitted that such trade understanding did not have a definite meaning in the trade and was not generally used because, if inquiry were made as to the name under which the merchandise is uniformly, generally, and definitely known in the trade wherever such is bought and sold, the answer would not be "amorphous graphite," but rather a certain trade name and number, or a sample standard and description; that even with all the evidence submitted it is not clear how, when, where, and under what circumstances the term "amorphous graphite" is used in the trade; and that, therefore, the plaintiffs have failed to establish a commercial designation for the imported merchandise. As authority for its contention the Government relies upon the case of *United States* v. *Sheepshearers Merchandise and Commercial Co.*, 20 C. C. P. A. 327, T. D. 46112, and the case cited therein, to wit, *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. 459, T. D. 43916.

We are of the opinion that the cases cited by the Government are not in point in the controversy now before us. In the *Sheepshearers* case, *supra*, the merchandise consisted of blades for animal clippers and were so assessed under the *eo nomine* designation therefor in paragraph 357, act of 1922. The plaintiff contended that the articles were free of duty under paragraph 1504 as all other agricultural implements of any-kind or description not specially provided for, whether in whole or in parts. Under such paragraph it was specially provided that no article specified by name in title I shall be free of duty under this paragraph. The plaintiff attempted to prove through commercial testimony that there was a distinction between the blades for animal clippers and machines used for clipping the wool from

sheep and that the blades for clipping wool were not commerically known as blades but rather as combs and cutters. The court found that there was no evidence as to the manner in which the articles were bought and sold, or of the trade name or trade usage in buying and selling or of the common meaning of the terms. The evidence tended to show that the words "animal clippers" were hardly ever used in the trade, but there was nothing to indicate a commercial designation different from the common meaning, and nothing to show that there was a designation that was uniform, definite, and general in the trade and commerce throughout the United States, or the custom of the trade in dealing in such articles.

In the *Passaic Worsted Co.* case, *supra*, certain machines were classified as textile machinery and claimed dutiable as all other machines. The machines were used for cleansing wool, the result being the same as obtained by the wool farmer when wool is washed while upon the sheep. The test applied by the court was whether or not the machines were used in the manufacture of wool and it was found that they were not. However, the Government attempted to prove a commercial designation, but the court rejected such proof, having found that the evidence produced was opinion-evidence only, concerning which the court stated that the opinion of witnesses, from which the true facts could not be made available upon cross-examination, is not competent in proving commercial designation.

The questions before us in this case are: First, whether or not Congress, in providing a duty upon various forms of graphite, used the terms of description of such forms in their common significance or in their understanding as used in the trade and commerce of the United States; second, whether or not a product is susceptible of commercial designation when confined to a particular trade when such terms would be meaningless to the community at large; and third, whether or not an amorphous graphite generally understood by its particular trade to include a product having certain attributes, even though bought and sold under certain manufacturers' descriptions rather than under the statutory term of "amorphous graphite," is susceptible of commercial designation.

In considering the first question, we find that the common meaning of graphite as defined by various lexicographers includes a carbon having a certain crystalline nature and other well-known characteristics. Funk and Wagnalls New Standard Dictionary, page 1067, describes graphite as follows:

A metallic iron-black to dark steel-gray, sectile, flexible variety of carbon, crystallizing in the hexagonal system.

The Century Dictionary and Cyclopedia, page 2601, defines it as:

One of the forms under which carbon occurs in nature (see carbon), also known as plumbago and blacklead. It has an iron gray color and metallic luster, and

occurs in foliated masses and embedded scales. It is soft and unctuous to the touch, makes a black shining streak on paper, and is used chiefly in the manufacture of pencils, crucibles, and portable furnaces, for burnishing iron to protect it from rust, and for counteracting friction between the rubbing surfaces of wood or metal in machinery.

The term "amorphous" is defined in Webster's New International Dictionary, Second Edition, as follows:

Having no determinate form; of irregular shape; shapeless; formless.

Crystalline is defined in the same dictionary in language following:

Of, pertaining to, or of the nature of, a crystal or crystals; formed by crystallization; having regular arrangement of the atoms in a space lattice;—opposed to *amorphous*

In tracing the legislation upon the subject of graphite, we find that in the Tariff Act of 1913 paragraph 579 provided for the free entry of "Plumbago." When the Tariff Act of 1922 was under consideration by the Congress, the American producers of graphite urged that a duty be placed thereon. Consequently surveys were made by the Tariff Commission and many hearings were conducted before congressional committees, where the American producers of graphite, the importers, and American grinders presented their respective views. The Tariff Information Surveys, volume 8, 1921, described graphite as follows:

a soft, black, greasy form of carbon, sometimes referred to in the trade as "plumbago" and "blacklead." That it occurs in nature in two forms, crystalline and amorphous, each having its own peculiar uses.

*Crystalline graphite* is commonly understood to mean graphite in crystals large enough to be seen with the naked eye. It is used for the manufacture of crucibles, as a lubricant, in paints, foundry facings, batteries, and stove polish.

*Amorphous graphite*, while frequently showing a crystalline structure under the microscope, is a trade name applied to amorphous or very fine-grained graphite of varying degrees of purity. It is used for foundry facings, as a lubricant, in pencils (blacklead), paints, high explosives, boiler compounds, electrodes, dry batteries and shoe and stove polishes.

Flake graphite is crystalline graphite produced in flakes or scales, while vein graphite is crystalline graphite in other forms, such as lump, chip, and dust.

As a result of the tariff hearings, crude or refined graphite or plumbago was placed in the dutiable list and divided into three commercial classes, to wit, amorphous, crystalline lump, chip or dust, and crystalline flake, all at varying rates of duty. Crystalline flake was defined in the act as having certain attributes. See paragraph 213 of the Tariff Act of 1922.

While the Tariff Act of 1922 was in force, importations of graphite were made from Canada which the collector classified as "crystalline." Upon protest of such classification, the matter came before this court for consideration. Upon the evidence presented the court held that a commercial designation had been established for the tariff term "amorphous graphite" as an article well known and uniform through-

out the United States prior to the enactment of the Tariff Act of 1922 and including the crystalline graphite there imported. The testimony established that there was a crystalline structure in all amorphous graphite. See *Tower & Sons* v. *United States*, T. D. 40660, G. A. 8932, decided February 4, 1925.

When Congress again provided for a duty upon graphite in the Tariff Act of 1930 the terms "amorphous" and "crystalline" as applied to graphite by the trade were not defined in the act as in the case of "crystalline flake." However, when the tariff was under discussion in Congress the Senate changed the original House bill by inserting therein definitions of amorphous and crystalline graphite, as follows:

As used in this paragraph, the term "amorphous" means graphite without crystalline structure; and "crystalline" means graphite or plumbago which has a definite crystalline structure and which occurs as relatively thin flakes disseminated throughout its containing rocks, or in veins, stringers, or masses within its containing rock, decomposed or not, and which may be or has been separated therefrom by ordinary crushing, pulverizing, screening, or mechanical concentration process, such graphite being made up of a number of parallel laminae, which may be separated by mechanical or chemical means or both.

While the bill was in conference between the House and Senate the Tariff Commission issued "Supplement to Tariff Information on Items in Bill Subject to Conference." At page 135, under the heading "Paragraph 213," appears the following:

Comment on phraseology.—Large quantities of graphite are imported annually from Canada under the amorphous classification, although it is stated in Canadian official publications that only crystalline graphite is mined in Canada. Amorphous graphite is said to be of visible crystalline structure when examined under the microscope. T. D. 40660 declares that amorphous graphite had a well-known and uniform commercial designation prior to enactment of the Act of 1922. Differentiation between crystalline dust and amorphous graphite is unquestionably difficult. If no distinction in the rates on various forms of crystalline graphite is intended the definitions might be entirely omitted as superfluous.

Thereafter the Senate receded from the amendment and the definitions of "amorphous" and "crystalline" were omitted from the final draft.

In enacting legislation placing a duty upon graphite in various forms, it would appear from the foregoing history that in using the descriptive words "amorphous" and "crystalline" Congress had no intention to use them in their common signification, but intended to apply the terms in the sense they were used in the graphite trade in the United States. It is a common practice for the Congress to *eo nomine* provide for duty upon articles under the trade signification thereof rather than under the common meaning. In the case of *Cadwalader* v. *Zeh*, 151 U. S. 171, the court stated that the rule of commercial designation is equally applicable where a term is confined

in its meaning not merely to commerce but to a particular trade, and in such case also the presumption is that the term was used in its trade signification, as a tariff law may use language not intended for the community at large, but for merchants, or for a particular trade, and such as to mislead those for whom it is intended if not taken in the commercial sense.

The wholesale trade in crude or refined graphite is confined to the wholesalers and importers of the material, or to the grinders thereof, who sell it to manufacturers to be made into specific products, and the wholesale trade in such material is localized in the United States, and the dealers in such material who testified for the plaintiffs had bought and sold in the wholesale trade in such districts.

The plaintiffs have clearly established that the definitions of "amorphous" and "crystalline," as commonly known at and before the enactment of the Tariff Act of 1930, are not applicable to graphite, because all graphite is recognized as being crystalline in nature, and that the trade understanding of the terms should prevail. Throughout the graphite trade the term "amorphous" is generally understood to apply to a graphite which may easily be ground into a powder, while the term "crystalline" is applied to a graphite which is difficult to reduce to powdered form. Therefore, in the trade understanding, it is not the quantity of crystals that is contained in graphite which determines its classification, but the character of such crystals. That is to say, a crystalline graphite which will easily reduce to a powder under ordinary grinding conditions is considered "amorphous" while a graphite which tends to flatten out into flakes and is difficult to reduce to powdered form is considered "crystalline" in the commercial understanding of the terms.

In respect to the application of commercial testimony to a product that is confined to a particular trade we are of the opinion that the case of *Cadwalader* v. *Zeh, supra,* amply covers the subject.

Relative to the contention that the plaintiffs failed to establish a commercial designation for the term "amorphous graphite" because the material was dealt in between buyer and seller under trade names or numbers, or standards shown by samples rather than through the particular description, "amorphous," we have thoroughly examined the law upon the subject of commercial designation and find that the courts have held it is not necessary that an article be presented to the trade under the precise tariff term if it is embraced by the generic tariff term or understood by the trade as being included in the class of articles covered by the tariff description. That is to say, an article may be bought and sold in a certain trade as being included within a tariff description, and so regarded by the wholesale buyers and sellers of the article, and yet, when actually purchased or sold, more

specific descriptions may be used, which both the purchaser and seller recognize as an article within a specific class, without the special mention thereof.

In the case of *United States* v. *Goldberg's Sons*, 3 Ct. Cust. Appls. 282, T. D. 32573, the court stated that an article is commercially known by a certain term when the wholesale trade of this country generally and uniformly throughout the country regards and classifies such article as being included in a certain class of articles.

In the case of *Austin, Nichols & Co.* v. *United States*, 4 Ct. Cust. Appls. 261, T. D. 33483, the merchandise involved consisted of capers. There was no *eo nomine* designation for capers in the tariff act and they were claimed dutiable as a nonenumerated manufactured article. The Government contended that the capers were dutiable as pickles. Commercial testimony was introduced to establish that capers were not commercially known as pickles. It was established that the article was always dealt in under the specific name of capers and never under the name of pickles. Nevertheless, the appellate court held that commercially capers were pickles. In so holding the court stated:

> It is clear that many articles belonging to well-known classes may nevertheless always pass in trade under more specific names, but this fact alone would not necessarily withdraw them for tariff purposes from the larger class to which the species may belong.
>
> The board was justified in the conclusion that the present testimony does no more than disclose a case of that character. While the capers in question are invariably called capers, nevertheless they possess certain qualities and characteristics which bring them within the class of pickles.

In the case of *Watson, Geach & Co.* v. *York Metal & Alloys Co., United States Appearing*, 14 Ct. Cust. Appls. 449, T. D. 42112, the court stated that:

> except in cases where there is a clear and prior understanding between the purchaser and seller of scrap steel as to the particular class or kind or grade of scrap steel desired by the purchaser, such class or grade must be stated in orders for same, or the seller would be unable to intelligently fill the order or make delivery.

In the case of *United States* v. *Wile*, 22 C. C. P. A. 267, T. D. 47327, certain merchandise invoiced as "Sauce Bercy" and "Sauce Bordelaise" was claimed dutiable as sauces. Commercial testimony was introduced to establish that the merchandise was known throughout the trade as sauces. The court held that proof of commercial designation must be made of the exact statutory word or words and as none of the witnesses were asked whether the merchandise was commercially designated as "sauces," and because the evidence established that the merchandise was commercially designated as "Sauce Bercy" and "Sauce Bordelaise," it was held that commercial designation had not been established. However, in the case of *Neuman &*

*Schwiers Co., Inc.* v. *United States*, 24 C. C. P. A. 127, T. D. 48606, the identical merchandise was again before the court. The *Wile* case was incorporated therein and ten additional witnesses testified for the plaintiff as to the commercial meaning of the word "sauces." The witnesses testified without exception that at the time of, and prior to, the enactment of the Tariff Act of 1930, the word "sauces" had a definite, general, and uniform meaning in the trade and commerce of the United States; that the articles imported were included within the trade designation of the word "sauces," and that the imported articles were designated by the wholesale trade, definitely, uniformly, and generally as "sauces." The testimony in that case as to the mode of buying and selling the imported material was substantially as follows: That the articles were sold according to the way they were labeled; that when customers bought Sauce Bercy and Sauce Bordelaise, they used the word "sauces"; that the seller knew they were sauces although *most people did not know the definition of the word "sauces" and bought sauces under the brand* and expected to get what they bought; *that sauces were bought on the label designated on the bottle* and the articles were all included within the word "sauces" in the trade understanding; that in selling Sauce Bercy and Sauce Bordelaise *the witnesses sold them under the specific name of Sauce Bercy and Sauce Bordelaise.* The court stated:

* * * The Supreme Court, in the very early consideration of these matters, as in the noted case of *Two Hundred Chests of Tea*, 9 Wheat. 428, recognized that customs laws were particularly adapted for use by merchants, and that it might well be that commodities which were well known among those who were engaged in the trade, under a certain designation might not be so known, by those who were not engaged in trade; that the Congress was to be understood as speaking in terms of the trade; and that if an article, although not commonly known as designated by the law, was uniformly, definitely, and generally known by that designation in the trade and commerce of the country, it should be included within the statutory term. This rule has been carried down through the years, continuously. However, as we pointed out in the *Wile* case, *supra*, and in many other cases, it was not intended to include articles within a statutory designation by proof that the article was, in fact, commercially known by some similar name. We have reiterated this doctrine repeatedly. * * *.

In the case at bar it has been established that amorphous graphite, as that term is regarded in the trade, definitely, uniformly, and generally, includes graphite with a crystalline structure which is susceptible of being broken down into a powdery substance easily by commercial grinding methods; that the graphite the subject of importation herein comes within that class of the trade designation of amorphous and that it is generally regarded by the particular graphite trade using such material as amorphous graphite; that, when sold, it is sold under particular trade names or numbers which indicate to the purchaser that it is a particular class of amorphous graphite; and that it is under-

stood by the seller that he is selling amorphous graphite and by the purchaser that he is buying amorphous graphite as distinguished from crystalline graphite.

We are of the opinion that the evidence submitted by the plaintiffs unquestionably establishes that the imported material is embraced within the tariff designation of amorphous graphite, and that Congress, in using the term "amorphous," had in mind the trade terminology of that class of graphite known as "amorphous" in the trade, to wit, the class of graphite which would be readily reduced to a powder by commercial grinding methods, as distinguished from a graphite which could not be so readily reduced.

For the reasons stated judgment will be entered in favor of the plaintiffs and the collector is directed to reliquidate the entries and to make refund of all excess duty taken.