(C.D. 3023)

THE HY-GLOW COMPANY
WILLIAMS CLARKE CO. ET AL.     *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 5, 1967)

*Glad & Tuttle* (*Edward N. Glad* and *Robert Glenn White* of counsel) for the plaintiffs.

*Carl Eardley*, Acting Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

OLIVER, Judge: The protests in this case, consolidated at trial, cover merchandise generally referred to on the invoices as "Christmas Light Bulbs" and classified by the collector within paragraph 229 of the Tariff Act of 1930, as modified by T.D. 53865 and T.D. 53877, at the rate of 10 per centum ad valorem, as "Incandescent electric-light bulbs and lamps: with metal filaments: Miniature Christmas tree lamps."

Plaintiffs contend that the merchandise is dutiable under the same paragraph at a rate of only 9 or 8 per centum ad valorem, depending upon the specific entry date, by virtue of a 1962 trade agreement modification of paragraph 229, which reduced the duty on incandescent electric light bulbs and lamps with metal filaments, with the exception of miniature Christmas tree bulbs and lamps.

The issue, therefore, revolves around the phrase "miniature Christmas tree" and whether or not the instant articles are described within the exception carved out by trade agreement. An additional assessment of 0.32 cents a pound under section 4541(3) of the Internal Revenue Code, as modified, on the copper content of the articles is not in dispute.

The relevant modified portions of paragraph 229 read as follows:

Paragraph 229, Tariff Act of 1930, as modified by T.D. 53865 and T.D. 53877:

Incadescent [sic] electric-light bulbs and lamps:
    Without filaments or with metal filaments_____ 10% ad val.

Paragraph 229, Tariff Act of 1930, as modified by T.D. 55615:

Incandescent electric-light bulbs and lamps (except miniature Christmas tree) with metal filaments _____ [Effective 7/1/62] 9% ad val. [Effective 7/1/63] 8% ad val.

At the trial, plaintiffs called one witness and introduced five exhibits into evidence. The defendant offered the testimony of one witness and two exhibits.

Mr. Harold A. Tucker, called by the plaintiffs, testified that he is and has been for 7 years a "manufacturing plant factory man" with the Hy-Glow company of Los Angeles, Calif., manufacturer of Christmas light outfits and strings. He stated that the company also imports Christmas light lamps, approximately 10 million per year. His duties at the plant consist of supervision of personnel, receiving, shipping, and all production. He had the same duties with the Radiant Manufacturing Company of Seattle, Wash. They also manufacture Christmas light strings, and he worked for them for 3 years before going to Hy-Glow. Prior to that, he was employed for 8 years by a variety store retail chain in the State of Washington, working as manager of

three different stores in that state. During that time he purchased, displayed, and sold Christmas light strings and Christmas lamps.

Mr. Tucker testified that in all this experience he had become familiar with three basic sizes of Christmas lamps, viz, miniature, candelabra, and intermediate base lamps. He explained that "miniature" would represent a C–6 lamp, "candelabra," an indoor C–7½ lamp, and "intermediate," either a C–9½ or C–9¼ outdoor lamp, and that these terms would appear on purchase orders and invoices. He proceeded to identify the following: Plaintiffs' exhibit 1—an intermediate base lamp; plaintiffs' exhibit 2—the same as exhibit 1 but with a flasher light bulb; plaintiffs' exhibit 3—a candelabra base lamp; plaintiffs' exhibit 4—the same as exhibit 3 but also with a flasher bulb attached; and plaintiffs' exhibit 5—a C–6 bulb with a miniature base. Exhibits 1 through 4 were received as representative samples of the invoiced merchandise under protest, the parties stipulating that they contain metal filaments. The filaments on exhibits 2 and 4 part, when heated, and come together again, when cooled, thus causing a winking or flasher effect. Exhibits 1 through 4 are used in Christmas light strings of 7, 15, 25, or 40 lights, wired in parallel so that, if one burns out, the rest continue to light.

The witness also testified that he had become familiar with the uses of plaintiffs' exhibits 1 through 5 in the States of Washington and California by selling them and "like everyone else, observing the use of them at every Christmas season." He stated that exhibits 1 and 2 are used "ninety percent of the time" as decorations on the eaves of houses and around doors and windows; that they are designed for outdoor use; and that, in his opinion, they are not suitable for use on indoor trees "because they burn too hot" and would dry out the tree too fast. Exhibits 3 and 4 are used mostly indoors "on Christmas trees," and the same is true for plaintiffs' exhibit 5.

Mr. Edgar E. Coleman, testifying for defendant, was identified as a man having 35 years of sales experience in the lamp division of the General Electric Company, the last 10 of which as district sales manager for the west coast area for the miniature lamp department of General Electric. This area embraces about 11 Western States, including California and Washington, and sales in the category of miniature Christmas lamps run to approximately 15 million per year. Approximately 10 years ago, the lamp division of General Electric was divided into the following three subdivisions or departments: Large, miniature, and photo.

With respect to plaintiffs' exhibit 1, Coleman testified to the following: That his firm sells them as C–9½ miniature lamps and that they are so known in the trade; that they are sold both individually and in strings; and that he has on many occasions seen them used in the 11 states he covers on both indoor and outdoor trees at Christmas.

He denied ever hearing that there was danger in using them indoors on trees and that their laboratory determines such things. He stated that his testimony, except as to bulb size designations, would be the same as to plaintiffs' exhibits 2, 3, and 4. Defendant's collective exhibit A, later marked A and A-1, was received into evidence as literature distributed by the General Electric Company to the wholesale and retail trade throughout the United States. On the exhibit marked A-1, the witness identified merchandise such as plaintiffs' exhibits 1 through 4 by their lamp number and ordering designation explaining that they are all sold as miniature lamps. His company sells all four types to the Hy-Glow Company.

On cross-examination, referring to defendant's collective exhibit A, Coleman testified that the word "miniature" appears in two places in their trade literature, once in the title "Miniature Lamp Department" and once at the bottom of each exhibit to identify the type base used with C-6 bulbs.

On redirect, he stated that the use of the word "miniature" in the title describes the lamps appearing on the exhibits, while the second use of the word "miniature" describes a base used on one of these lamps.

Mr. Tucker, called in rebuttal by the plaintiffs, stated that he was familiar with the invoices received from General Electric on sales to Hy-Glow and that exhibits 1 and 2 were described thereon as intermediate base lamps, C-9¼; that exhibits 3 and 4 were described as C-7½ candelabra base lamps; and that exhibit 5 was described as a C-6 miniature base lamp.

Back on cross-examination, Tucker admitted that it had been 3 or 4 years since he handled these invoices, and he was not certain as to whether they were headed with the notation "Miniature Lamp Department."

Finally, on surrebuttal, Mr. Coleman returned to the stand to testify that he was generally familiar with his department's invoicing procedure and that the heading "Miniature Lamp Department, General Electric Company" does appear on their invoices.

Plaintiffs advance the following twofold theory in an attempt to overcome the presumed correctness of the collector's classification: First, at the time of the tariff negotiations which resulted in Presidential Proclamation No. 3468 (T.D. 55615) in 1962, there was a recognized "commercial and tariff meaning" for the term "miniature" as it applied to lamps so as to exclude the merchandise under protest in these cases; and second, there has been a *prima facie* showing that the imports do not have chief use as "Christmas tree lamps."

The Government takes the position that there has been no showing of a commercial designation for the term "miniature" which differs from its common meaning; that the imports are within that common

meaning; and that plaintiffs have not shown that these lamps are not chiefly used on Christmas trees.

It would be difficult to doubt that plaintiffs, although never expressly claiming so, have argued for a commercial designation for the term "miniature" which would exclude lamps such as plaintiffs' exhibits 1 through 4 because of the presence of either candelabra or intermediate bases. A claim for commercial designation of a tariff term need not be stated in so many words, but the party asserting a known commercial meaning must show by a preponderance of evidence that such meaning is general, definite, and uniform throughout the land. *Stephen Rug Mills* v. *United States*, 32 CCPA 110, C.A.D. 293; *Nylos Trading Company* v. *United States*, 37 CCPA 71, C.A.D. 422. Moreover, the prime source of such evidence should come from those who actually deal in or are conversant with the wholesale trade in which the imported merchandise travels and the designation it receives therein. *Rice Millers' Association, American Manufacturers* v. *United States and Oberle (Inc.)*, 15 Ct. Cust. Appls. 355, T.D. 42560; *United States* v. *Briggs Manufacturing Co.*, 14 Ct. Cust. Appls. 1, T.D. 41526; *Daniel Green Shoe Co.* v. *United States (Trans World Shoe Corp., Party In Interest)*, 58 Cust. Ct. 7, C.T. 2868.

The testimony of plaintiffs' witness Tucker was perforce limited to his commercial experiences in the States of California and Washington and in no sense could it be said to speak of trade practices *generally* in the United States. Furthermore, insofar as his testimony sought to establish a trade recognition for plaintiffs' exhibit 5 as the only "miniature *base* lamp," [italics supplied] it did not necessarily equate it to or explain the commercial meaning of the tariff expression "miniature lamps."

More importantly, however, the testimony of Mr. Edgar E. Coleman of the General Electric Company, a firm well known for its prime position in this industry,[1] directly undermines plaintiffs' position on this issue. Not only in the States of California and Washington but in nine other Western States as well, Coleman's wholesale experience is to the effect that each type of lamp under protest here is commercially traded as a "miniature lamp." The terms "candelabra," "intermediate," and "miniature" are further used merely to describe various base sizes, the lamps as a whole remaining miniature in overall proportion. Defendant's collective exhibit A, literature distributed throughout the country, corroborates Coleman's testimony as to the uniformity of his firm's trade practices.

In their brief, plaintiffs refer the court to several source volumes published through the years (earliest 1924 and latest 1948) under the auspices of the United States Tariff Commission as well as to the Hearings Before the Senate Finance Committee on the Tariff Act of 1930.

---

[1] Summaries of Tariff Information (1948), volume 2, part 2, page 122.

As emphasized above, the prime source of information on the commercial meaning of a tariff term is the testimony of those knowledgeable in the wholesale trade. In this respect, the record before us completely fails to establish the existence of a general, definite, and uniform meaning for "miniature lamps" as asserted by plaintiffs herein. Furthermore, as the commercial meaning of a term is that in effect at the time of enactment, the references cited by plaintiffs, however subject to interpretation, are sufficiently remote from the 1962 Trade Agreement as to be inadequate guides to the court's determination. *R. J. Saunders & Co., Inc.* v. *United States*, 49 CCPA 87, C.A.D. 801; *United States* v. *Weigert-Dagen et al.*, 39 CCPA 58, C.A.D. 464.

Failing to establish a commercial designation for the term "miniature lamps," the common meaning becomes applicable. In determining common meaning, courts primarily rely upon lexicons. *United States* v. *C. J. Tower & Sons of Buffalo, N.Y.*, 48 CCPA 87, C.A.D. 770; *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, C.A.D. 735. Dictionary definitions, as pointed out by defendant, generally define "miniature" as something on a much smaller scale vis-a-vis normal or regular sized objects. We find nothing to rebut the presumed finding of the collector on this point and, indeed, the samples themselves appear as significantly smaller items than the ordinary or regular household lamp.

Turning to plaintiffs' alternate theory of this case, i.e., that the imported articles are not chiefly used as Christmas tree lamps, it similarly appears that the burden to establish a different chief use to negate the collector's finding has not been carried. Mr. Harold Tucker, plaintiffs' own witness, freely admitted that exhibits 3 and 4 were used mostly "on Christmas trees" and, therefore, there is no evidence to dispute the collector's classification with respect to these lamps. As to exhibits 1 and 2, neither the testimony of Tucker nor the samples themselves give rise to a *prima facie* showing of chief use. Once again Tucker's testimony was limited to observations of use in but two states, while the samples appear equally adaptable to use on trees as any other place mentioned. The additional use testimony of the Government's witness Coleman merely exaggerates what is otherwise an inadequate record on this final issue.

Thus, in view of the issues raised and the evidence presented to meet those issues, we find for the defendant and hold that the protests be overruled. Judgment will be rendered accordingly.