**ESCO MANUFACTURING CO., aka J. Hofert Co.**

v.

**UNITED STATES.**

**Court No. 72–1–00240; C.D. 4585.**

United States Customs Court.
Feb. 11, 1975.

Glad, Tuttle & White, Los Angeles, Cal. (Robert Glenn White, Los Angeles, Cal., of counsel), for plaintiff.

Carla A. Hills, Asst. Atty. Gen. (Joseph I. Liebman, New York City, trial atty.), for defendant.

MALETZ, Judge:

This case involves the proper tariff classification of electric filament lamps scribed on the invoices as C–9¼ type, 120 volt "Christmas Light Bulbs" or "Christmas Bulbs."[1] The articles—which were imported from Japan via the port of Los Angeles in 1970 and 1971—were classified by the government under item 686.30 of the tariff schedules as "Christmas-tree lamps" and assessed duty at the rate of 10 percent ad valorem.

---

1. The terms "bulb" and "lamp" are used interchangeably throughout the record. For that reason, reference in this opinion to either term includes and represents the other. It is further to be noted that the designation 9, 9¼, or 9½ in the C–9, C–9¼, or C–9½ bulb and the designation 7 or 7½ in the C–7 or C–7½ bulb represents the number of eighths of an inch at the maximum diameter of the glass envelope. (For example, the C–7 bulb measures ⅞ of an inch at the maximum diameter.) Finally, it is to be observed that the imported bulb is referred to interchangeably in the record as a C–9 or C–9¼ or C–9½ bulb and that the C–7 bulb is referred to interchangeably as a C–7 or C–7½ bulb. Therefore, for purposes of this opinion, the terms C–9 and C–7 will be used to refer to the respective bulbs.

Plaintiff claims that the imported lamps are properly classifiable under item 686.90, of the tariff schedules, as modified by T.D. 68–9, as "other electric filament lamps, designed for operating at 100 volts or more" with duty at the rate of either 5.5 or 4.5 percent ad valorem, depending on the date of entry.[2]

Set forth below are the provisions of the tariff schedules relevant to this action:

10. *General Interpretative Rules.* For the purposes of these schedules—

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i. e., the use which exceeds all other uses (if any) combined;

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Electric filament lamps and electric discharge lamps \* \* \*

Filament lamps:

| | | 1970 | 1971 |
|---|---|---|---|
| 686.30 | Christmas tree lamps ................ 10% ad val. | | |
| | \*　\*　\*　\*　\*　\*　\* | | |
| | Other: | | |
| | \*　\*　\*　\*　\*　\* | | |
| 686.90 | Designed for operating at 100 volts or more. | 5.5% ad val. | 4.5% ad val. |

With respect to these provisions, the parties agree in the pleadings that item 686.30 covering "Christmas-tree lamps" is a use provision whose ambit is controlled by general interpretative rule 10(e)(i). The parties also agree that if the government's classification under item 686.30 is found to be erroneous, then the claimed classification under item 686.90 would be correct. In this setting, plaintiff contends that the weight of the evidence establishes that the imported C–9 lamps are not chiefly used on Christmas trees and, therefore, cannot be classified under item 686.30. In this connection, plaintiff argues that the term Christmas tree as used in item 686.30 is limited to vegetation which is in fact a tree and does not cover vegetation of any other form such as shrubs, etc.

Defendant, on the other hand, maintains (1) that plaintiff has failed to establish that the imported C–9 lamps are not members of a class or kind of lamps whose chief use was as Christmas-tree lamps; (2) that even assuming that plaintiff has established that the im-

2. At trial plaintiff abandoned its claim with respect to protest 27041003288.

---

ported C–9 lamps *per se* were not chiefly used in the manner contemplated by item 686.30, they still would be classifiable under that item since they are of a class which encompasses both C–9 and C–7 lamps and plaintiff has failed to prove that this class was not chiefly used in the manner contemplated by item 686.-30; and (3) that item 686.30 is an *eo nomine* by use provision under which the common meaning of the term "Christmas-tree lamp" is not limited to lamps used on "Christmas trees" *per se* but includes lamps used for such related purposes as decorating other trees, shrubs, houses, offices, etc.

### I

Turning to the record, five witnesses were called by plaintiff and two by defendant.[3] All of the five witnesses were engaged in the business of Christmas lights and decorations and all were qualified to testify thereon. From their testimony and the accompanying 28 exhibits, the following facts emerged: The imported C–9 lamp is a small, 10-watt, intermediate-base bulb, which is specifically designed to produce colored light. It is primarily sold and used during the Christmas season which extends from mid-November to the end of December.

There are two major categories of Christmas lamps, i. e., the C–9 lamp which is known as the outdoor type, and the C–7 lamp, a candelabra-base bulb, which is known as the indoor type. These lamps are marketed in the Christmas decoration or so-called Trim-a-Tree sections of department, variety, and other stores.

The C–9 bulb is designed for use, and is primarily used, outdoors. However, it is frequently used indoors in shopping centers, malls, banks and display areas to decorate large trees and other objects. Thus it is promoted as both an outdoor and indoor lamp. The C–7 bulb, on the other hand, is primarily used indoors for decorating Christmas trees and is concededly a "Christmas-tree lamp" within the meaning of item 686.-30.

Over 95 percent of all C–9 and C–7 lamps are used in Christmas light strings which consist of: A length of wire with a plug at one end to connect the wire to a power source; a series of individual sockets spaced between 12 and 15 inches apart; and a device at the other end to enable the string to be connected to another string. · Each of the sockets on the string is designed to hold a Christmas lamp; in addition, each socket contains a hook, clip or bead to allow the light string to be attached to a Christmas tree branch.[4] The light string with which the C–9 bulb is used

---

3. Plaintiff called the following witnesses: (1) Edward Scott, general manager of the decoration department of the plaintiff firm, J. Hofert Co., which does business as Esco Manufacturing Co. and is engaged in manufacturing and assembling Christmas lights, importing decorations, and dealing in natural and artificial Christmas trees; (2) Frank L. Kams, a vice president of Noma World Wide, Inc., a manufacturer and importer of Christmas decorations; (3) Howard W. French, a commercial representative for various firms in the Christmas decoration field, including the plaintiff company; (4) Max Fradkin, a vice president of New York Merchandise Co. which, among other things, imports and manufactures Christmas tree light bulbs and decorations; and (5) Ralph Kayser, production manager for the plaintiff company for the past four years and, prior to that, president of the Hy-Glow Company

whose business is manufacturing, importing and distributing Christmas lights.
Defendant called as witnesses: (1) K. Miyamoto, vice president of merchandising for Moskatels, Inc., a seven-store California retail chain establishment, whose business includes Christmas decorations, craft supplies, artificial flowers, and florist supplies; and (2) Lou Lehmann, a Christmas product and marketing specialist of the General Electric Company, in· which capacity he is responsible for the design, application, marketing and advertising of General Electric's complete Christmas product line of light bulbs and sets.

4. The decoration of eaves, doorways and windows requires special clips which are affixed to the outside of a house so that the light string wires can be hung from them.

is made of 18-gauge wire which is thicker and of higher wattage than the 20-gauge wire used with the C–7 lamp string set, and for that reason the C–9 bulb is the only Christmas lamp approved by the Underwriters' Laboratories (UL) for outdoor as well as indoor use.[5] However, both the C–9 and C–7 bulbs are constructed with flange seals, and both, therefore, are waterproof. Accordingly, while the C–7 can be used outdoors, it lacks UL approval therefor because the 20-gauge wire in the light string with which it is used does not meet the requisite UL standards. Aside from that, the C–7 bulb has a smaller base and envelope than the C–9 bulb and thus will not fit into a C–9 socket. Both sizes are standard throughout the industry.

All the witnesses agreed that the C–9 bulbs were used for decorating trees, shrubs, eaves, doorways and windows of homes. However, there was no such agreement as to their predominant use. Three of plaintiff's witnesses testified that from their observations the predominant use of the imported C–9 bulbs was to trim houses. Of the two remaining witnesses for plaintiff, one testified that the use of the C–9 on trees was "infinitesimal," while the other, the general manager of plaintiff's decoration department, stated that no one use outdoors predominated over any other. By contrast, defendant's witness, the Christmas product marketing specialist of General Electric, testified that the principal use of the C–9 bulbs was outdoors as Christmas decorations on trees and shrubs.

As for terminology, the witness Scott, the general manager of plaintiff's decoration department, testified that his firm did not refer to C–9 bulbs as "Christmas tree lights' but rather referred to them as "Christmas lamps." In support of this testimony, it was shown that the company's regular boxes referred to C–9 bulbs as "Outdoor Christmas Lamps" and to C–9 bulb and light string sets as "Weatherproof Outdoor Lights." However, on cross-examination, it was brought out that from time to time plaintiff packaged C–9 bulb and light string sets in boxes which were captioned "Holiday *Tree* Lights For Outdoor and Indoor Use." [Emphasis added.]

Another witness for plaintiff, Max Fradkin, a vice president of New York Merchandise Co., which sells between 20 and 25 million C–9 bulbs a year, testified that the C–9 and C–7 bulbs handled by his company were usually referred to as outdoor or indoor lamps and not as Christmas tree lamps. That notwithstanding, the witness described his firm as an importer and manufacturer of *"tree lights."* R. 129. [Emphasis added.] He further testified that it was his responsibility to "purchase the *Christmas tree light bulbs* and decorations for New York Merchandise Company as a whole." R. 131. [Emphasis added.] Also, it was brought out that the witness' company packaged its C–9 bulb and light string sets in boxes bearing the caption *"Christmas Tree Lite*—25 Light Multiple Set." [Emphasis added.]

The other three witnesses called by plaintiff testified that the term "Christmas-tree lamp" was not frequently used in the trade to identify the C–9 or C–7 bulb. Rather, according to their testimony, these bulbs were usually referred to as outdoor or indoor Christmas lamps.

To similar effect, the witness Lehmann, the Christmas product and marketing specialist for General Electric, testified that General Electric in its advertising and marketing did not refer to either the C–7 or C–9 bulb as a "Christmas-tree lamp." He added that the word "tree" was dropped merely for abbreviation purposes but emphasized that in industry parlance, in referring to C–7 or C–9 lamps, the terms "Christmas-tree lamps" and "Christmas lamps" are one and the same.

---

5. The Underwriters' Laboratories is a nonprofit organization established by insurance companies to prescribe safety standards for various electrical items.

The remaining witness for defendant, a vice president for merchandising of a retail chain establishment which deals in Christmas decorations, testified that in his trade both the C–7 and C–9 bulbs were known as Christmas tree lamps.

## II

■ Against this background, it must be concluded that plaintiff has failed to overcome the presumption of correctness attached to the government's classification under item 686.30 in that it did not establish that the *class* or *kind* of merchandise imported was not chiefly used on Christmas trees.

Under the provisions of general interpretative rule 10(e)(i), "a tariff classification controlled by use (other than actual use) is to be determined in accordance with *the use* in the United States at, or immediately prior to, the date of importation, *of articles of that class or kind* to which the imported articles belong, and the controlling use is the chief use, i. e., the use which exceeds all other uses (if any) combined;" [emphasis added].

■ After reviewing the entire record, the conclusion is inescapable that the C–9 lamps here in issue are of the same class or kind as the C–7 lamps. First of all, it is clear from the record that the C–7 and C–9 lamps were marketed and sold in the same manner during the Christmas season and through the same channels of distribution. The record also establishes that the predominant use by far (i. e., over 95 percent) for both C–7 and C–9 lamps is in Christmas lighting strings for decorative purposes at Christmastime. In this connection, it is to be noted (as mentioned previously) that each socket of a Christmas lighting string contains a hook, clip or bead to allow the light string to be attached to a Christmas tree branch. Further, both the C–7's and the C–9's

belong to the same product line and were displayed, advertised and uniformly referred to in the same manner. Thus, in the six catalogues in evidence, the C–7 and C–9 bulbs were without exception listed on the same pages and uniformly characterized in the same way as "Christmas lamps" or "Christmas lights" or "Christmas tree lights" or "replacement lamps" or "replacement bulbs." Moreover, except for size, both the C–7 and C–9 bulbs were constructed in the same manner, and each had the same kind of flange seals to render them waterproof. It is true that the C–9 bulb is primarily used outdoors, while the C–7 is primarily used indoors. But this is due not to any difference in the construction of the bulbs but rather to the difference in the gauge of the wire of the light string with which the bulbs are used. In other words, it is not the bulb which distinguishes its use indoors or outdoors but the light string with which the bulb is used. Then, too, regardless of the place of use, both plaintiff's and defendant's witnesses agreed that the decorative effect of the C–7 and C–9 lamps is the same. Thus, considering the record and the characteristics of the merchandise itself,[6] the C–7 and C–9 lamps belong to the same class or kind of articles. That class or kind of articles comprises lamps which are used primarily in Christmas lighting string sets for decorative purposes, as opposed to other types of light sets.

In the foregoing circumstances, it was incumbent upon plaintiff to establish that the predominant use of the class as a whole, i. e., C–7 and C–9 lamps combined, was not for the decoration of Christmas trees. In this regard, it is important again to observe that the C–7 lamps are concededly "Christmas-tree lamps." This being the case, even though it were to be assumed that plaintiff had proven that the C–9 lamps *per*

---

6. See, e. g., United States v. Colibri Lighters, 47 CCPA 106, 109, C.A.D. 739 (1960); United States v. Baltimore & Ohio R.R. Co., 47 CCPA 1, 3, C.A.D. 719 (1959).

*se* were not chiefly used to decorate Christmas trees, this would still not be sufficient to overcome the presumption of correctness attendant upon the government's classification. For plaintiff has failed to establish that the class of articles as a whole—which includes both the C–7 and C–9 lamps—was not chiefly used on Christmas trees. The fact is that on this score, plaintiff presented no evidence whatever, let alone evidence as to the total size of the class, or the percentage breakdown between C–7 and C–9 lamps within that class.

Plaintiff, however, argues that in The Hy-Glow Company et al. v. United States, 58 Cust.Ct. 481, 486, C.D. 3023 (1967) this court recognized that C–9 lamps are a class or kind of article separate from the C–7 lamps. However, there is nothing in that decision to show that the class or kind issue was ever argued or considered by the court in rendering its decision. The *Hy-Glow* case was concerned with the correct classification of Christmas light bulbs, which included C–6, C–7, and C–9 lamps. The lamps were classified by the collector under a provision of paragraph 229 of the Tariff Act of 1930, as modified, which covered "miniature Christmas tree lamps." Plaintiff claimed that the importations were dutiable under the same paragraph of the Tariff Act, as modified by a trade agreement, which reduced the duty on electric light bulbs and lamps, with the exception of "miniature Christmas tree lamps." Plaintiff claimed the imported lamps were not of the "miniature Christmas tree" type and hence were dutiable at the lower rate prescribed by the trade agreement. The court sustained the collector's classification on the ground that the importations came within the common meaning of the term "miniature lamps."

The court also rejected plaintiff's alternative argument that the imported articles were not chiefly used as Christmas tree lamps. As to this, the court noted (1) that plaintiff's own witness admitted that C–7 lamps were used mostly on Christmas trees; and (2) that with respect to the C–9 lamps, neither the testimony of plaintiff's witness nor the samples gave rise to a prima facie showing of chief use. It is quite true that on this phase of the case, the court in *Hy-Glow* considered the C–7 and C–9 lamps separately with regard to the Christmas tree lamp issue. But this hardly can be regarded as dispositive of the issue here as to whether the C–7 and C–9 lamps are of the same class or kind since that issue was neither argued nor considered by the court in *Hy-Glow*.

### III

Lastly, it is to be noted that this court has indicated that item 686.30 covering "Christmas-tree lamps" is an *eo nomine* provision.[7] Mobilite, Inc. v. United States, 70 Cust.Ct. 359, 365, C. R.D. 73–11, 358 F.Supp. 267, 272 (1973).[8] Considering item 686.30 to be an *eo nomine* provision, the common meaning of the term "Christmas-tree lamps" becomes relevant.

On this aspect, both plaintiff's and defendant's witnesses testified that in the industry C–7 and C–9 lamps were only occasionally referred to as "Christmas-tree lamps"; instead, they were usually referred to as Christmas lamps (with the word tree omitted); or as indoor or outdoor lamps; or merely as C–7's or C–9's. But regardless of the terms used to describe these lamps, it is conceded that the C–7 lamp is a type of lamp that is properly classifiable under the

---

7. It will be recalled that in the pleadings in the present case the parties have taken a different position, agreeing that item 686.30 is a use provision.

8. Similarly, paragraph 218(f) of the Tariff Act of 1930, as modified, covering "Christ-

mas tree ornaments" was held to be an *eo nomine* provision. Gallagher & Ascher Company v. United States, 57 Cust.Ct. 348, 352, C.D. 2813 (1966).

provision for "Christmas-tree lamps." In other words, even though the C–7 is a "Christmas-tree lamp" it was not usually so referred to in the industry.

■ The fact, however, that C–7 lamps, as well as C–9 lamps, were not usually referred to as Christmas-tree lamps does not mean that they were not commonly *known* as such. Indeed, plaintiff's witness Fradkin, vice president of New York Merchandise Co.—which (as noted before) sells in excess of 20 million C–9 bulbs a year—admitted that such bulbs were always known to customers as Christmas tree lights. See R. 147–148.[9] Likewise, defendant's witness Miyamoto testified that in the retail trade both the C–7 and C–9 bulbs were known as Christmas tree lamps. Further, defendant's witness Lehmann testified that so far as General Electric was concerned the word "tree" was dropped from its advertising merely for abbreviation purposes but emphasized that in the industry, when referring to C–7 or C–9 lamps, the terms "Christmas-tree lamps" and "Christmas lamps" are one and the same.

■ Bearing mention too is the fact (1) that the New York Merchandise Co. packaged its C–9 bulb and light string sets in boxes bearing the caption *"Christmas Tree lite—25 Light Multiple Set"* [emphasis added]; and (2) that plaintiff itself from time to time packaged such sets in boxes captioned "Holiday *Tree* Lights for Outdoor and Indoor Use." [Emphasis added.]

Pertinent also is the following quotation from The Underwriters' Laboratories, Inc. Electrical Appliance and Utilization Equipment List (May 1968), p. 73:

## CHRISTMAS-TREE AND DECORATIVE-LIGHTING OUTFITS
### (60 HO)

In listing Christmas-tree and decorative-lighting outfits, it is assumed that any medium-base, *intermediate-base, candelabra-base,* or miniature-base *lamps* to be used in these devices are made in accordance with United States of America Standard specifications, whether or not the lamps are actually supplied with the set or are inserted in the lampholders. The use of lamps which are not in conformance with such standards may present shock hazards or high temperature conditions which are in excess of safe limits of operation. [Emphasis added.]

Recalling that the C–9 bulb is an intermediate-base lamp and the C–7 a candelabra-base lamp, it is obvious that according to the Underwriters' Laboratories both types are used in "Christmas-*Tree* * * * Lighting Outfits." [Emphasis added.] This being the case, since the C–7 bulb is concededly a "Christmas-tree lamp" used in a Christmas-*tree* lighting set, it necessarily follows that the C–9 bulb which is used in the identical way is likewise considered by the Underwriters' Laboratories to be a "Christmas-tree lamp."

Further relevant is the following excerpt from Tariff Commission Report No. 133, Incandescent Electric Lamps (2d series, 1939), pp. 27–28:

*Miniature lamps of standard types.* —Classified by methods of manufacture, miniature lamps are of two main types: (1) flange-seal and (2) butt-seal. Flange-seal lamps are similar to large lamps in that the bulbs are sealed around the flange of the mount,

---

9. As discussed previously, it is interesting to note that although Fradkin testified that the C–9 and C–7 bulbs handled by his company were usually referred to as outdoor or indoor lamps and not as Christmas tree lamps,

Fradkin described his firm as an importer and manufacturer of *"tree lights"* and stated that it was his responsibility to "purchase the *Christmas tree light bulbs*" for his company as a whole. See R. 129, 131.

whereas in butt-seal lamps the lead-in wires are sealed in a glass bead * * *. Flange-seal lamps include automobile headlight lamps, most of the miniature sign and decorative lamps, *and the larger Christmas-tree lamps designed for outdoor use.* * * * [Emphasis added in part.]

It is apparent that the Commission in referring to the miniature, flange-seal, larger, *Christmas-tree lamps designed for outdoor use* was making reference solely to the C–9 bulb. For as the record shows, this is the only bulb in the industry that fits the above description.

## IV

For the foregoing reasons, it is held that plaintiff has failed to overcome the presumption that the imported C–9 bulbs were properly classified by the government under item 686.30 of the tariff schedules as "Christmas-tree lamps." Therefore, plaintiff's claim is overruled and judgment will be entered accordingly.