The decision in the *Consolidated* case, *supra*, then states:

\* \* \* While we recognize that "machinery" is a less exact term than "machine," and that in consequence there may be a somewhat less rigid concept of machinery parts than of machine parts, we find no precedent that would lead us to conclude that Congress intended to embrace, as parts of printing machinery, an entirely separate machine the function of which is to produce a material to be used in the printing machine.

Following the reasoning in *Consolidated International Equipment & Supply Co.* case, C.D. 2978, *supra*, we are likewise of the opinion that the involved merchandise does not fall within the category of printing machinery or parts of printing machinery as claimed herein.

In view of the foregoing, we are constrained to overrule the protest without affirming the classification of the collector.

Judgment will be entered accordingly.

(C.D. 3291)

REX-SPANALL, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 15, 1968)

*Siegel, Mandell & Davidson* (*Allan H. Kamnitz* and *David Serko* of counsel) for the plaintiff.

*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Arthur H. Steinberg*, trial attorney), for the defendant.

Before RAO and FORD, Judges

FORD, Judge: The protest at bar involves an importation of certain vertical building shores which were classified by the collector of customs under the provision in paragraph 372 of the Tariff Act of 1930, as modified, as machines, not specially provided for, other, and assessed with duty at the rate of 11½ per centum ad valorem.

Plaintiff claims the merchandise is properly classifiable under paragraph 312 of the said act, as modified, as columns or posts and all other structural shapes of iron or steel, dutiable at the rate of 7½ per centum ad valorem.

The pertinent provisions of the statutes involved follow:

Classified under:

Paragraph 372 of the Tariff Act of 1930, as modified by T.D. 54108:

Machines, finished or unfinished, not specially provided for:

       \*       \*       \*       \*       \*       \*       \*

    Other (\* \* \*)_____ 11½% ad val.

Claimed under:

Paragraph 312 of the Tariff Act of 1930, as modified by T.D. 52739:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel:

       \*       \*       \*       \*       \*       \*       \*

    Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting_____ 7½% ad val.

The record is comprised of the testimony of two witnesses for the plaintiff, one witness for the defendant, and the following three exhibits:

Plaintiff's illustrative exhibit 1, a catalog page depicting a Spanall vertical shore, marked by a witness with letters "A" through "I" designating its various parts; plaintiff's exhibit 2, an S–2 Spanall shore, stipulated as representative of the imported merchandise at bar; plaintiff's exhibit 3, a sales catalog of the Republic Steel Corporation entitled "Elyria Structural Steel Tubing" received into evidence for the purpose of showing that such catalog was offered by the Republic Steel Corporation to the trade and commerce of the United States.

The first witness for the plaintiff, Arthur C. Borgman, vice president since 1958 of Patent Scaffolding Company, a Division of Harsco Corporation, testified that Rex-Spanall, Inc., the plaintiff herein, was a division of his company. Rex-Spanall, Inc., manufactured, sold, and rented scaffolding and shoring equipment.

Mr. Borgman testified substantially as follows: That he has a bachelor of mechanical engineering degree from Pratt Institute, and has a professional engineer's license in New York and New Jersey. Before 1948, he was a design engineer with Republic Steel Corporation, Steel and Tubes Division; bearing engineer for E. S. Willis Company; assistant chief engineer of Patent Scaffolding from 1948 to 1950, and chief engineer from 1950 to 1958, for the same firm. His duties include design, layout of shoring jobs, and supervision of the engineering department. He is familiar with the articles at bar since he uses them in his business and observes them in actual use.

Mr. Borgman stated that the difference between the shores designated S–2, S–3, and S–4 was mainly height, the S–2 shore being the smallest and the S–4 the largest; that plaintiff's illustrative exhibit 1, a catalog page, illustrates the merchandise; that the Spanall shore is used as a temporary support for the form work of concrete structures, is removed along with the forms after the concrete reaches its required strength, and is reusable; that the shore was designed to support loads at various elevations and be as light as possible; that there were fittings on the shore to aid support; that the shore is adjustable to obtain correct elevation. The witness stated that in his opinion the tubing in the shore was "structural grade tubing"; that the shore was a column or a post and, therefore, a structural member with a load capacity of approximately 2,000 to 7,000 pounds, depending upon the size of the shore and its extension.

The witness marked plaintiff's exhibit 1 with letters "A" to "L" designating the various parts of a Spanall vertical shore and explained the function of each part as follows:

The upper plate "A", with nail holes to lock the form into place, is welded to the upper tube "B", to aid in supporting the wooden form work. The lower plate "I", also with nail holes, bears on the sill and supports the entire shore. A nailing plate "H" braces the shore to a column of the building. The tube "B" is adjustable and positioned with pin "C" through holes in "B" and bearing on the nut "F". Nut "F" gives the fine adjustment to get the correct elevation, after a quick adjustment has been made with the pin "C" through one of the holes in tube "B". The handle "G" is used in turning nut "F". "D" is the external tube into which tube "B" telescopes, also to which the threaded portion "E" is welded. "E" is the threaded portion on which the nut "F" adjusts.

The witness further testified that the tubing in the shores was rolled and the seams welded; that a welded tube is able to resist more twist and torsion than an open seam tube; that there is greater load bearing capacity in a welded tube than in an unwelded butted tube; that he had seen unwelded butted tubing used in playground equipment, columns in busses, and fence posts; that he considered the foregoing as structural uses; that he had seen butted tubing used in scaffolding, and he considered that a structural use; that the welding of the tubes used in the Spanall shores was necessary for them to be load bearing members, because the shores were subjected to torsion and twist.

On cross-examination, Mr. Borgman stated that the shores at bar consist of two metal tubes, with one tube fitting inside the other; that there are square-cut threads on a separate piece of tubing which is welded to the lower section; that on the outside of the larger tube there is a nut with similar internal threads; that when the handle is turned horizontally, the nut or collar travels up or down the tube, depending upon the direction in which the handle is turned, and that causes the vertical motion of the tubes; that there are holes and a slot in the tubes to receive the metal pin; that on the opposite ends of the tubes, there are metal plates with holes in them; that when the nut or collar is turned, the upper tube is raised; that in the actual and practical use of a shore or a column, there can be no assurance that the shore or column will not be subjected to torsion or twist; that the load bearing use of the unwelded tubes in the playground equipment, columns in busses, and fence posts, which he had referred to on direct examination, was only incidental; and that he did not know what the effect of height is on a tube with an open seam.

David Deutsch, president of Adria Construction Equipment Corporation, the second witness for the plaintiff, testified on direct examination that his firm imported, rented, and sold vertical steel shoring; that it was impossible for a workman to move the telescoping portion of a shore upward after the cement has been poured; and that after the cement hardens, the shore is lowered and is reused.

Joseph S. Adelson, a consulting metallurgical engineer licensed in the State of Ohio as a professional engineer, testified for the defendant substantially as follows:

Prior to becoming a consulting engineer, he had been chief metallurgical engineer with the Steel and Tubes Division of Republic Steel Corporation for 38 years; that the Steel and Tubes Division made welded tubing and a very small amount of unwelded tubing; that his duties as chief metallurgical engineer had included selection of raw materials to be used in tubing, determining the cause of mill problems, chemical analysis of raw materials, and sales engineering;

that he had observed the use of tubes by the customers of his company; that part of his duties had involved advising his customers whether to use welded or unwelded tubing; that he had supervised the testing of tubes by the metallurgical laboratory, including tests to determine their load bearing capacity; that he was a graduate of the Case Institute of Technology, with a degree in metallurgical engineering; that he had written a number of articles covering welded tubing which appeared in standard industry publications and in journals of technical societies; that he had presented papers before various technical organizations and was a research associate at the United States Bureau of Standards; was coauthor of a bulletin, "Physical Properties of Electrical Resistance Welded Tubing"; was a member of the subcommittee of the American Standards Association, which prepares or decides on standardization of specifications; was also a member of a subcommittee which wrote one of the sections in the handbook issued by the American Society for Metals, which covers cold drawn pipe and tubing; and that up to the time of his retirement from Republic Steel Corporation, he had written practically all the welded tube specifications for the American Society for Testing Materials (A.S.T.M.).

Mr. Adelson further testified that unwelded tubing with a seam was used for stands, fence posts, or similar applications where load bearing capacity was not important; that he had never seen shores with load sustaining parts in unwelded tubes; that all the shores which he had seen used for scaffolding had welded tubes.

Mr. Adelson further testified that the longer the tube in relation to its diameter, the less load it will support, and the greater the length of the tube, the greater the tendency for an unwelded seam to bulge open and cause premature failure; that in his opinion unwelded tubes with seams are not suitable for structural purposes; and on cross-examination, Mr. Adelson testified that he knew of no other method of making welded tubing than by rolling. We note in the record that the building shores herein were of welded tubing, hence the references in the record to unwelded tubing are immaterial.

The subject of building shores similar to those at bar has been before this court before. In *Acrow, Incorporated, and Frank P. Dow Co., Inc.* v. *United States*, 32 Cust. Ct. 356, Abstract 57727, certain building shores or jacks were classified by the collector of customs as articles or wares, not specially provided for, under paragraph 397 of the Tariff Act of 1930, as modified. On the record there presented, the court held the building shores or jacks properly classifiable as machines, not specially provided for, under paragraph 372 of the same act. The *Acrow* case is closely analogous to that now before us in that the building shores there were similar in construction, their manner

of functioning the same, and their use was to give temporary support to a structure, as might a column or pillar or post, which are provided for in paragraph 312, under which the plaintiff at bar now claims.

We are aware of course that paragraph 312 in no way indicates that for an article to be classified as a structural shape its use must be permanent. In *United States* v. *Frank*, 15 CCPA 97, T.D. 42184, it was stated:

* * * If a thing is in fact a structural shape, the fact that it may at times be used only in temporary construction does not remove it from that classification. It is shown in the case at bar that very considerable quantities of I beams and similar material are used for temporary work. * * *

Therefore, plaintiff's contention on this point is well taken. Whether the shores are columns, posts, or other structural shapes within the meaning of paragraph 312 presents a different question.

Definitions of "columns" and "posts" are as follows:

Webster's New International Dictionary, second edition, 1957:

column * * * 1. *Arch.* A kind of supporting pillar; esp.: a One consisting of shaft, base, and capital, the shaft being of circular section * * * b One of the vertical supporting members of a building, made of steel, cast iron, reinforced concrete, timber, or stone * * *. 2. Anything resembling such a column in form, position, or function; an upright body or mass. * * *

*       *       *       *       *       *       *

post, n. 1. A piece of timber, metal, or other solid substance, fixed, or to be fixed, firmly in an upright position, esp. as a stay or support; a pillar; prop; as, a hitching fence, a sheath * * * or telegraph post; * * *.

Funk & Wagnalls New "Standard" Dictionary of the English Language, 1952:

column, n. 1. *Arch.* (1) A vertical shaft, usually having both a base and a capital, and primarily for the support of superincumbent weight, as an entablature, balcony, or statue. * * * (2) In iron and steel structures, a supporting shaft frequently extending to the roof and consisting of various sections fitted together. * * * 2. Any structure or other object resembling a column in form and position; figuratively, a prop or support.

*       *       *       *       *       *       *

post, n. 1. An upright piece of timber, metal, or other material, used as a support, a point of attachment, * * *.

Careful analysis of these definitions leads us to a different interpretation from that urged by plaintiff's counsel in their brief, i.e., that "the shores are structural shapes within the meaning of that term as it appears in paragraph 312, since they are the stated exemplars; columns or posts, and they serve the sole function of supporting maximum

loads with a minimum use of material." There is no dispute that the shores support a maximum load with a minimum of material. This, however, does not *ipso facto* convert building shores into columns or posts or structural shapes. We note the opinion of plaintiff's witness, Mr. Borgman, that the building shore at bar "is a column or post, and therefore it is a structural member." This is a conclusion of law outside the province of the witness and represents the actual issue for this court to decide. In no definition of either column or post is there any suggestion that either term would embrace a movable part. Indeed, the assemblage of movable parts which comprise the jack presents so distinctive an article as to completely differentiate it from either a column or post.

In the *Acrow* case, *supra*, it was the plaintiff who claimed that similar imported shores were machines properly dutiable under paragraph 372 and T.D. 51802, claiming alternatively classification as structural shapes of iron or steel but not pressing the latter claim. Said claim was, therefore, not considered in that decision, and the court sustained the primary claim that the shores were machines. *United States* v. *Guth Stern & Co.*, 21 CCPA 246, T.D. 46777; *United States* v. *J. E. Bernard & Co., Inc.*, 30 CCPA 213, C.A.D. 325, and others.

The court therein made the following observations:

> * * * we see no escape from the conclusion that the involved jacks or building shores are machines. * * * They have movable parts and do some of the things pointed out in the *Simon, Buhler* case [8 Ct. Cust. Appls. 273, T.D. 37537]. They are mechanical contrivances which utilize and apply force for the transmission of motion.

Counsel for the plaintiff herein filed a reply brief in response to defendant's reference in its brief to the recent case of *Laurence Myers Scaffolding Co.* v. *United States*, 57 Cust. Ct. 333, C.D. 2809, alleging that the defendant was relying quite heavily on that case. The *Laurence Myers Scaffolding* case, involving certain bridge overhang shores, highway shores, and building shores, arose under the Tariff Schedules of the United States, which became effective August 31, 1963, whereas the case at bar is governed by the Tariff Act of 1930, as modified. An analysis of the *Laurence Myers Scaffolding* case and the adjudicated *Acrow* case which is governed by the earlier statute, provides, in our opinion, support to the position of defendant. The court in the *Myers* case, *supra*, after considering the definition of columns, pillars, and posts, concluded that running through the definitions of columns, pillars, or posts is the element of unitary construction. The imported article at bar is not of unitary construction. We, accordingly, find that the involved shores are not columns, pillars, or posts or structural shapes within the purview of paragraph 312, *supra*.

Based on the record and our analysis of the adjudicated cases examined, particularly on the *Acrow* case, *supra*, which we deem controlling, we find and hold the building shores or jacks at bar properly classifiable as machines, not specially provided for, under paragraph 372 of the Tariff Act of 1930, as modified by T.D. 54108, at 11½ per .centum ad valorem, as classified by the collector.

The protest claim, therefore, is overruled.

Judgment will issue accordingly.