(C. D. 4802)

S.G.B. Steel Scaffolding & Shoring Co., Inc., plaintiff, *v.* United States, defendant

Court Nos. 72-2-00394 and 73-6-01355

(Decided May 16, 1979)

*Siegel, Mandell & Davidson*, Esqs. (*Stephen M. Zelman, Herbert T. Posner* and *Allan H. Kamnitz*, Esqs., of counsel) for the plaintiff.

*Barbara Allen Babcock*, Assistant Attorney General, *Joseph I. Liebman*, Attorney in Charge, Field Office for Customs Litigation, *Laura D. Millman* and *Sidney H. Kuflik*, trial attorneys, Esqs., for the defendant.

NEWMAN, Judge: This consolidated action is a sequel to *S.G.B. Steel Scaffolding & Shoring Co., Inc.* v. *United States*, 70 Cust. Ct. 158, C.D. 4423, 361 F. Supp· 631 (1973), *aff'd*, 61 CCPA 73, C.A.D. 1123, 496 F. 2d 1224 (1974) (hereinafter *SGB I*). As in *SGB I*, the issue here pertains to the proper tariff classification for certain "shore frame systems" and parts thereof.

The within merchandise was imported by plaintiff from Great Britain during 1970 and 1971 and entered at the Port of New York. The regional commissioner of customs assessed duty at the rate of 13 or 11 per centum ad valorem, depending upon the dates of entry, under the "basket" provision for articles of iron or steel in item 657.20 of the Tariff Schedules of the United States (TSUS), as modified by T.D. 68–9. Plaintiff claims that the imports are classifiable as "other structures and parts of structures" within the purview of the superior heading to items 652.90–652.98, TSUS, and are properly dutiable at the rate of 9.5 per centum ad valorem under item 652.98.

I have concluded that plaintiff's claim should be sustained.

## STATUTES INVOLVED

The pertinent provisions of the Tariff Schedules, as modified by Presidential Proclamation 3822 (T.D. 68–9), are:

*Classified under:*

Schedule 6, Part 3, Subpart G:

Subpart G.—Metal Products Not Specially Provided For

*Subpart G headnote:*

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\* \* \* \* \* \* \*

Articles of iron or steel, not coated or plated with precious metal:

\* \* \* \* \* \* \*

Other articles

\* \* \* \* \* \* \*

657.20      Other _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    13% [or] 11% ad val. [depending on the dates of entry]

*Claimed under:*

Schedule 6, Part 3, Subpart F:

Hangars and other buildings, bridges, bridge sections, lock-gates, towers, lattice masts, roofs, roofing frameworks, door and window frames, shutters, balustrades, columns, pillars, and posts, and other structures and parts of structures, all the foregoing of base metal:

\* \* \* \* \* \* \*

652.98      Other _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    9.5% ad val.

## ISSUE PRESENTED

Inasmuch as there is no dispute that the shore frame systems are "[a]rticles of iron or steel," as classified by the Government, the core issue herein, broadly stated, is whether the imports are more specifi-

cally described in the superior heading to items 652.90–652.98 as "other structures and parts of structures," as claimed by plaintiff.[1]

## PRIOR PROCEEDINGS

In *SGB I*, the shore frame systems were classified as articles of iron or steel under item 657.20, TSUS, as modified, and claimed by plaintiff to be properly dutiable as jacks or lifting machinery or parts thereof under item 664.10, TSUS, as modified. In dismissing the action, the court held that a shore frame system is more than a jack or lifting machinery, and aptly referred to the merchandise as a "structure" or a part thereof. Thus, as the linchpin of his decision, Judge Rao stated (70 Cust. Ct. at 164–65):

> * * * The system, by means of stacking shore frames one on top of another, allows a *structure* to be built to any height required for supporting formwork in which concrete is poured, e.g., for floors, during the construction of a building. The jacks make necessary adjustments at the ground level and at the top but the system itself is more than a jack. It is construction equipment *consisting of a self-supporting temporary structure* having jacking devices to lift the heads to the proper height for holding the formwork. The other functions of the system, supporting and distributing the weight of the load, and resisting lateral forces, and its self-contained bracing which contributes stability and safety and enables a *temporary structure* of great height to be erected, are coequal with that of the jacks. * * * [Emphasis added.]

Continuing, the court also observed in *SGB I* (70 Cust. Ct. at 165):

> As in *Laurence Myers Scaffolding Co.* v. *United States, supra* [57 Cust. Ct. 333, C.D. 2809, 259 F. Supp. 874 (1966), *appeal dismissed,* 56 CCPA 133 (1967)], the court is not called upon to pass on the question of whether the instant shore-frame system constitutes "other structures" or "parts of structures" within the superior heading to items 652.90–652.98, dutiable under the catchall provision, item 652.98. *I note, however, that substantially similar language in heading 73.21 of the Brussels Nomenclature is intended to encompass adjustable or telescopic props and similar equipment for use in scaffolding.* (Explanatory notes, vol. 2, p. 674.) [Emphasis added.]

The present action initially came before me for decision on plaintiff's motion for summary judgment in accordance with rule 8.2. Defendant opposed the motion on the ground that there existed a material issue of fact that required resolution by a trial. In view of the existence of a genuine issue of fact concerning the commercial meaning of the term "structure" in the construction industry and the application of that term in its commercial sense to the shore frame systems, I denied plaintiff's motion. *S.G.B. Steel Scaffolding & Shoring Co., Inc.* v. *United States,* 76 Cust. Ct. 274, C.R.D. 76–2 (1976).

---

[1] Under general interpretative rule 10(c). "an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it * * * ."

## The Record

The record in this case comprises: The incorporated record in *SGB I;* the testimony of four witnesses on behalf of plaintiff and three witnesses on behalf of defendant; documentary exhibits; and the official entries and invoices (which were received without marking).

Plaintiff's witnesses were: Robert A. O'Callaghan, secretary-treasurer of S.G.B. Universal Builders Supply,[2] a distributor of scaffolding, shoring, and concrete formwork throughout the United States; Joseph M. Titunik, vice president of engineering for S.G.B. Universal and a licensed professional engineer; Robert M. Hiener, a civil engineer and chief engineer for General Reinsurance Corp.; and Charles W. Thurston, a licensed professional engineer and professor of architecture at Columbia University, who teaches various courses relating to structures.

Defendant called: Anthony V. Rizzi, a licensed professional engineer and president of Rissil Concrete, Inc., a concrete subcontractor specializing in the erection of reinforced concrete structures and concrete floors; Francis W. Meyer, a licensed professional engineer, chairman of the civil and architectural technology department at the State University of New York at Farmingdale, and a consultant in engineering for contractors; and William Eipel, a licensed professional engineer and president of Eipel Engineering, P.C.

The pertinent facts are:

The shore frame systems herein are the same as those involved in *SGB I,* and comprise a number of components fitted and used together for various supporting or load-bearing purposes. The principal components of the systems are two end frames (each consisting of two vertical parallel posts connected by three horizontal crossbars), cross bracing, and various attachments for height adjustment, stability, load distribution, and for holding the load superimposed on the systems. Additionally, there are connectors which permit the stacking of the shore frames. An assembled shore frame system, as illustrated in defendant's exhibit A, is shown below:[3]

[2] This firm was created by a merger of S.G.B. Steel Scaffolding & Shoring Co., Inc., Universal Builders Supply and S.G.B. Epic (R. 8).

[3] The specific parts which are the subject of the complaint are: frames, cross braces, adjustable screws, U-heads, J-heads, plate heads and bases, nailing plates, staff attachments, adjustable base plates, connectors, screw jacks, and adjustable screw handles (complaint, par. 9).

The record establishes the following uses for the shore frame systems: Support formwork for concrete construction until the wet concrete hardens; temporary support for existing floors during alteration or repair; support for sidewalk bridges; support for protective canopies; support for plastic housing over a construction job for winter weather protection; support for temporary bridging between buildings for transportation of men and materials; scaffolding; and support of bins for grain silos and cement silos (R. 9, 15, 44, 57, 58–59, 61).

When the imports are used to shore concrete construction, the height of the system is adjustable to make it level. After the wet concrete hardens and becomes self-supporting, the shore frame system can be lowered so that the formwork into which the wet concrete was poured can be removed. The system is movable without disassembly by skidding or rolling, or it can be disassembled and moved to another floor of a building.

Further references to the record will be made *infra* in connection with a discussion of the parties' contentions.

### PARTIES' CONTENTIONS

Plaintiff contends that, predicated upon the common meaning of the term "structure" (as indicated by definitions in various lexicographic authorities), the evidence of record, applicable judicial precedents, and Congressional intent (as evidenced by the "Explanatory Notes to the Brussels Nomenclature"), the shore frame systems are within the purview of the provision for "other structures and parts of structures" in the superior heading to items 652.90–652.98, TSUS. Plaintiff argues, moreover, that "defendant should be precluded from

proof of either a common meaning of the term 'structure' which varies from the definition alleged in answers to plaintiff's interrogatories, or of a commercial meaning for said term" (brief, p. 12).

Defendant, relying upon commercial meaning and the rule of *ejusdem generis,* urges a restrictive interpretation of the term "structure" which excludes the imports. Defendant argues, furthermore, that its answers to plaintiff's interrogatories were never offered into evidence and therefore are not before the Court.

### COMMERCIAL DESIGNATION

As mentioned above, plaintiff's motion for summary judgment was denied on the ground that there existed a genuine issue of fact for trial concerning the commercial meaning of the term "structure," and the application of that term, as used in its commercial sense, to the subject merchandise. Accordingly, the parties were afforded an opportunity at a trial to offer evidence of the commercial understanding of the term "structure."

Plaintiff now urges that defendant's proof concerning the meaning of "structure" should be circumscribed by the definition of that term as set forth in answers to plaintiff's interrogatories. However, defendant's responses to plaintiff's interrogatories were not offered into evidence by plaintiff at the trial, and consequently as a procedural matter are not before the court. Rule 6.3(b) explicitly provides that "the answers [to interrogatories] may be used to the extent permitted by the rules of evidence." Hence, to be considered by the court, answers to interrogatories must be introduced into evidence and cannot merely be judicially noticed. *Bracey* v. *Grenoble,* 494 F. 2d 566, 570, n.7 (C.A. 3, 1974); *Heilig* v. *Studebaker Corp.,* 347 F. 2d 686, 689 (C.A. 10, 1965). See also Wright and Miller, "Federal Practice and Procedure," section 2180, p. 572 (1970).

We now turn to the Government's argument that "[t]he focus of the term structure must be viewed by its *commercial designation* or the interpretation commonly placed upon it by the particular industry involved"; and that "[o]nly in the absence of proof as to a *commercial designation* are tariff terms construed in accordance with a 'common meaning' which in any way differs from the way in which the term is used in commerce." (Emphasis added.) (Brief, pp. 27, 29.) [4]

Implicit in the doctrine of "commercial designation" is the premise that the trade understanding of the tariff term differs from the com-

---

[4] Defendant's posture concerning the issue of commercial meaning has been equivocal. Thus, at the trial, Government counsel stated that "there is *no commercial designation* but * * * there is a commercial context which is different from a common [meaning]" (R. 13). (Emphasis added.) Also, at trial, Government counsel contended that the "commercial context" of the term "structure" differed from the common meaning (R. 48). However, in its post-trial brief (at p. 27), defendant inconsistently argues: "It is plaintiff, *not defendant,* which is suggesting the possibility that the commercial meaning of the term in issue is basically different from its common meaning." (Emphasis added.)

mon meaning. Stated otherwise, the doctrine has no application where the commercial and common meanings are the same. *Stephen Rug Mills* v. *United States*, 32 CCPA 110, C.A.D. 293 (1944); *Draeger Shipping Co.* v. *United States*, 15 Ct. Cust. Appls. 190, T.D. 42234 (1927).

Hence, as very recently pointed out by the Court of Customs and Patent Appeals, *per curiam*, in *Excelsior Import Associates, Inc.* v. *United States*, 66 CCPA —, C.A.D. 1212, 583 F. 2d 513 (1978):

> * * * The well-established rule respecting trade sense is that "before the plain understanding of a term can be deviated from it must be shown by plenary proof to have a different import in trade and commerce." *United States* v. *Wells, Fargo & Co.*, 1 Ct. Cust. Appls. 158, 161, T.D. 31211 (1911). The Government relied on the plain understanding of the term "ornamented" articles. Thus, appellant had the burden of proving that "ornamented" textile articles, as used in the TSUS, had a *commercial designation or trade sense different from the common meaning or plain understanding of that phrase.* * * * [Emphasis added.]

In *Wells, Fargo*, cited *supra* in *Excelsior*, the Court of Customs Appeals further expounded upon statutory interpretation in accordance with commercial designation (1 Ct. Cust. Appls. at 161–62):

> It is a rule of statutory interpretation, confined not alone to the customs laws, but running through the universal scope of law, the "words and phrases are assumed to be used in their natural signification" and shall be so construed, the sole exception in customs adjudication being that commercial designation shall obtain over the common and accepted understanding of words where such is duly proven.* * *
>
> *      *      *      *      *      *      *
>
> The legitimate corollary of this often-pronounced rule of interpretation is that no meaning shall be given a word or phrase used in customs laws other than its ordinary or accepted meaning *except upon plenary proof that this extraordinary meaning is fully and completely understood and accepted throughout the United States by all of those dealing wholesale in that class of goods.*
>
> The rule is based upon the sound principle that customs laws are drawn in view of the lay understanding (first) of the trade subject thereto, and (secondly) for the information of merchants and dealers who are not lawyers, and perchance may not be skilled in the finesse of the English language and who, with a common lay understanding, will be completely informed by the plain words of the statute as drawn by Congress what duties are levied and what penalties they may expect for a violation of the law. [Emphasis added.]

It is basic, of course, that tariff terms presumably carry the meaning given them in trade and commerce. *Ameliotex, Inc.* v. *United States*, 65 CCPA 22, C.A.D. 1200, 565 F. 2d 674 (1977); *Esco Manufac-*

*turing Co., aka J. Hofert Co.* v. *United States,* 63 CCPA 71, C.A.D. 1167, 530 F. 2d 949 (1976). Further, it is well settled by a long line of decisions that the language of commerce is presumptively that language in common use; and in the interpretation of tariff laws, words are to be taken in their commonly received and popular sense, or according to their commercial designation, if that designation differs from the ordinary understanding of the word. See for example, *Rosenblad Corp.* v. *United States,* 49 CCPA 81, C.A.D. 800 (1962); *United States* v. *C. J. Tower & Sons of Buffalo, N.Y.,* 48 CCPA 87, C.A.D. 770 (1961); *Floral Arts Studio et al.* v. *United States,* 46 CCPA 21, C.A.D. 690 (1958); *United States* v. *The Specialty House, Inc., et al.,* 42 CCPA 136, C.A.D. 585 (1955); *United States* v. *E. Dillingham, Inc.,* 41 CCPA 221, C.A.D. 555 (1954); *C. J. Tower & Sons* v. *United States,* 41 CCPA 195, C.A.D. 550 (1954); *Hummel Chemical Co.* v. *United States,* 29 CCPA 178, C.A.D. 189 (1941); *United States* v. *M. J. Brandenstein & Co.,* 17 CCPA 480, T.D. 43941 (1930); *S & T Imports, Inc.* v. *United States,* 78 Cust. Ct. 45, C.D. 4690 (1977).

Since defendant posits that the commercial meaning of "structure" differs from its common meaning (R. 13, 48), defendant has the burden of proof on that issue. *United States, etc.* v. *Simon Saw & Steel Co.,* 51 CCPA 33, 38, C.A.D. 834 (1964); *The Specialty House, Inc.,* 42 CCPA at 141; *Heads and Threads, Division of MSL Industries, Inc.* v. *United States,* 60 Cust. Ct. 308, 313, C.D. 3374, 282 F. Supp. 484 (1968). Proof of commercial designation is a question of fact to be established in each case. *Tower & Sons* v. *United States,* 11 Ct. Cust. Appls. 261, T.D. 39080 (1922); *Florsheim Shoe Co., Division of Interco, Inc.* v. *United States,* 71 Cust. Ct. 187, C.D. 4495 (1973); *Daniel Green Shoe Co.* v. *United States, (Transworld Shoe Corp., Party in Interest),* 58 Cust. Ct. 7, C.D. 2868, 262 F. Supp. 375 (1967). The commercial meaning of a term is that meaning in effect at the time of the enactment of the tariff schedules. *Cf. R. J. Saunders & Co., Inc.* v. *United States,* 49 CCPA 87, 89, C.A.D. 801 (1962); *The Hy-Glow Co. et al.* v. *United States,* 58 Cust. Ct. 481, 486, C.D. 3023 (1967).

Insofar as defendant claims a "commercial designation" for the term "structure," defendant had the burden of establishing that, as used in the trade at the time of the enactment of the Tariff Schedules, such term had a meaning which was general (extending over the entire country), definite (certain of understanding), and uniform (the same everywhere in the country). *Moscahlades Bros., Inc.* v. *United States,* 42 CCPA 78, 82, C.A.D. 575 (1954); *United States* v. *M. & D. Miller, Inc.,* 41 CCPA 226, 235, C.A.D. 556 (1954); *Nylos Trading Co.* v. *United States,* 37 CCPA 71, 73, C.A.D. 422 (1949); *Stephen Rug Mills,* 32 CCPA at 116. Thus, the doctrine of commercial designation

"was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted." *Jas. Akeroyd & Co. et al.* v. *United States,* 15 Ct. Cust. Appls. 440, 443, T.D. 42641 (1928). See also, *United States* v. *Fung Chong Co.,* 34 CCPA 40, 42, C.A.D. 342 (1946).

In light of the foregoing legal principles, we now consider the evidence of record respecting the commercial meaning of the term "structure."

Defendant's first witness, Rizzi, testified that the term structure, "particularly with myself and people that I talk to in the [construction] industry," means "an assemblage of elements designed to take load and in addition provide space, protection from the elements, and habitation" (R. 104–5). He provided one example—a building (R. 105, 108). Hence, after defendant's counsel questioned Mr. Rizzi concerning hangars, buildings, bridges, bridge sections, lock-gates, towers, lattice masts, roofs, roofing frameworks, door and window frames, shutters, balustrades, columns, pillars and posts, the witness testified (R. 108):

> Q. Are all these items that you have mentioned in answer to my question structures or parts of structures in the meaning of the construction industry? * * *—A. The *complete list* that you talked about, *generally the building is considered to be a structure.* * * * [Emphasis added.]

With respect to lattice masts, which are one of the statutory structures enumerated in the superior heading, Rizzi stated that they are "very often *similar* to a structure" (emphasis added). And further while on direct examination, Rizzi testified that a structure in general has a degree of permanence, he readily admitted on recross-examination that a Bailey bridge is regarded as a structure notwithstanding that it is "a combination of structural steel elements which can be assembled in the field," and that such bridge is not designed to be permanent, but rather is capable of being moved about quickly (R. 122–23).

On cross-examination, Mr. Rizzi's definition of "structure" included the element of "environmental control" (R. 118). However, with respect to bridges (a statutory structure), Rizzi conceded that such element was "very incidental at best" (R. 120). Finally, on cross-examination, the witness characterized a shore frame system as "a complex structure which has many redundancies which is very difficult to analyze analytically" (R. 121).

Defendant's second witness, Professor Meyer, defined the term "structure" as "materials used to encompass space for the public use," and stated that such meaning is a general architectural definition (R. 165). It is apparent from Meyer's testimony on cross-

examination that his concept of a "structure" like that of defendant's first witness, is limited to *buildings*. Thus, on cross-examination, Meyer testified (R. 175–76):

Q. * * * When you are discussing structures you mean buildings, don't you?—A. Yes.

Q. That's what you are limiting your testimony to, the fact that the imported merchandise depicted by Plaintiff's Exhibit 1 is clearly not a building?—A. Yes.

Q. Therefore, in your opinion it is not a structure?—A. A building is a structure, yes. This [shore frame system] still is a piece of equipment that is used for manufacturing the building.

Upon prompting by Government counsel on redirect-examination concerning bridges, bridge sections, hangars, and towers, Professor Meyer admitted (with qualification) that they would also be "structures," stating (R. 183):

A. Within my definition, materials made to protect the public, I would say generally, *from what you* [referring to Government counsel] *have said*, these would also be structures. [Emphasis added.]

Further, on cross-examination, Meyer agreed with the following definition of "falsework" set forth in a text entitled "Formwork for Concrete" by M. K. Hurd, at page 314 (plaintiff's exhibit 3):

FALSEWORK—the temporary *structure* erected to support work in the process of construction. In discussion of concrete construction, the term may be used much the same as *formwork* to include *shores* or vertical posts, forms for beams or slabs, and lateral bracing. [R. 163.] [Emphasis added in part.]

Professor Meyer conceded that a shore frame system is encompassed by the foregoing definition of "falsework" (R. 164) which is, according to the definition, a "temporary structure."

When on cross-examination, Meyer was read the description of "Scaffold-Type Shoring" on page 183 of the Hurd text (plaintiff's exhibit 3–B) [5] and was presented with the illustrations of such shoring on page 68 of the text (plaintiff's exhibit 3–A), he admitted that the imports are similar to the scaffold-type shoring depicted on page 68 (R. 170–71).

Defendant's witness, Eipel, used the term "structure" as synonymous with "building" (R. 202), as did the other two Government witnesses; and testified that in the construction industry, shore frame systems are not considered as "structures" (R. 197, 220). Nevertheless, Eipel acknowledged that "falsework," as defined in plaintiff's exhibit 3–A, is a "temporary structure" (R. 200), and further

---

[5] This description reads as follows: "Scaffold-type shoring is generally assembled in tower structures consisting of a pair of prefabricated frames, plus the diagonal cross bracing required to make the tower. * * *" Obviously .this description of scaffold-type shoring describes the instant shore frame systems.

conceded that there are many structures other than buildings (R. 213). Moreover, Eipel agreed with the expansive definitions of "structure" found on page 32 of the BOCA ("Building Officials & Code Administrators") building code (1970) and page 2–8 of the New York City Building Code (defendant's exhibit M) (R. 206, 208). The BOCA and New York City Building Code definitions of "structure" read:

> *The BOCA Basic Building Code/1970* (R. 206):
>
> *Structure:* An assembly of materials forming a construction for occupancy or use including among others, buildings, stadiums, gospel and circus tents, reviewing stands, platforms, stagings, observation towers, radio towers, water tanks, trestles, piers, wharves, open sheds, coal bins, shelters, fences and display signs.
>
> *Building Code—Local Law No. 76 of The City of New York* (Effective December 6, 1968, as amended to August 1, 1970) (defendant's exhibit M):
>
> *Structure:* An assembly of materials forming a construction for occupancy or use, including among others: buildings, stadia, tents, reviewing stands, platforms, stagings, observation towers, radio towers, tanks, trestles, open sheds, coal pockets, shelters, fences, and display signs.

Plaintiff's witnesses Titunik and Hiener testified that, as used in the building trade or in an engineering sense, the term "structure" encompasses an assembly of components designed to support a load, and that the shore frame systems fall within that definition (R. 45, 48–49, 59–60), Plaintiff's witness, Professor Thurston, defined a structure as an assembly of elements that supports a load *or* provides shelter, and stated that the shore frame systems are "structures" within his definition (R. 76, 84).

I find that the testimony of defendant's witnesses respecting a commercial meaning for the term "structure" is replete with contradictions, inconsistencies, and ambiguities. Indeed, the pronounced differences in the definitions of the term "structure" offered by both plaintiff's and defendant's witnesses demonstrate that there was no definite, general, and uniform trade understanding of the term. *Cf. Bloomingdale Bros. et al.* v. *United States*, 8 Ct. Cust. Appls. 314, T.D. 37596 (1918). Fundamentally, a commercial designation is not established where there is a conflict in the testimony of the witnesses in the trade as to the commercial meaning of the tariff term in dispute. *Downing* v. *United States*, 1 Ct. Cust. Appls. 500, T.D. 31530 (1911); *United States* v. *Jackson*, 1 Ct. Cust. Appls. 25, T.D. 30849 (1910); *Daniel Green Shoe Co., supra; Florsheim Shoe Co., supra; Heads and Threads, supra.*

Mr. Rizzi, whose concept of a "structure" was limited to buildings, nevertheless characterized a shore frame system as a "complex structure" (R. 121). Although Professor Meyer's architectural definition of

"structure" was similarly limited to buildings, he nevertheless agreed with the definition of "falsework" in plaintiff's exhibit 3, and testified that the shore frame systems were encompassed by that definition. Significantly too, Meyer admitted that the shore frame systems were similar to the scaffold-type shoring depicted on page 68 of the Hurd text, which is described on page 183 of that text as "*tower structures consisting of a pair of prefabricated frames, plus the diagonal cross bracing required to make the tower*" (emphasis added). Finally, defendant's witness Eipel endorsed the expansive definitions of "structure" as set forth in the BOCA and New York City Building Codes.

In support of its position that the shore frame systems do not fall within the asserted commercial meaning of "structures," defendant stresses the facts that in the purchase orders submitted to plaintiff for the merchandise (viz, defendant's exhibit D), such merchandise was referred to as "equipment", and in the construction trade the imports were known as shores or shore frame systems rather than as "structures".

Plainly, the TSUS term "structures" is a generic description, and particular structures are ordered and invoiced by more specific trade designations. The fact that the merchandise is commercially known by a specific name (viz, shores or shore frame systems), which name differs from a generic tariff description (viz, "structures"), is not sufficient to exclude the merchandise from classification under the latter designation. Thus, in *Heads and Threads, supra,* Judge Maletz specifically addressed this very point (60 Cust. Ct. at 314):

> * * * Similarly, where a party seeks to establish that merchandise is not included within the commercial meaning of a tariff term, it is a requisite that his proof show first, that the term had a commercial meaning in the trade differing from its common meaning; second, what that commercial meaning was; and third, that that meaning did not include the merchandise in controversy. *Ibid. It is not sufficient to show that at or prior to the enactment of the tariff law, the merchandise was always known by a name other than the tariff term.* * * * [Emphasis added.]

Accordingly, the imports cannot be excluded from classification as structures simply by proof that they are commercially known as shore frame systems or by other specific trade designations. Cf. *United States* v. *Henry L. Exstein Co., Inc.,* 16 Ct. Cust. Appls. 328, T.D. 43079 (1928); *United States* v. *Frank,* 15 Ct. Cust. Appls. 97, T.D. 42184 (1927); *Great Western Mercantile Co. et al.* v. *United States,* 25 Cust. Ct. 126, 131, C.D. 1275 (1950); *J. F. Starkey & Co.* v. *United States,* 6 Cust. Ct. 118, C.D. 244 (1941).

In summary, I am clear that defendant has failed to sustain its burden of establishing its claimed commercial designation for the term "structure." Adverting to the oft-repeated phrase in *Jas. Akeroyd &*

*Co., supra,* 15 Ct. Cust. Appls. at 443, "Commercial designation is a thing often claimed in customs litigation and rarely established."

### Common Meaning

As pointed out above, the fundamental inquiry in this case concerns the meaning of the term "structures" as used in the superior heading to items 652.90–652.98, TSUS.

In the absence of a special commercial designation, the language of a tariff statute is to be construed in accordance with its common meaning. A court, in determining common meaning, may rely upon its own understanding of terms used and may consult standard lexicographic and scientific authorities. *United States* v. *Corning Glass Works,* 66 CCPA—, C.A.D. 1216, 586 F. 2d 822 (1978); *Trans-Atlantic Co.* v. *United States,* 60 CCPA 100, C.A.D. 1088, 471 F. 2d 1397 (1973).

Although as acknowledged in my prior opinion (C.R.D. 76–2), there is no precise definition of the term "structure," it should be noted that the common meaning of tariff descriptions lacking precise definitions has frequently been applied by the courts. For example, in *United States* v. *Idl Mfg. & Sales Corp.,* 48 CCPA 17, C.A.D. 756 (1960), Judge Rich writing for the Court of Customs and Patent Appeals, recognized that the term "machine" does not have a precise definition, observing (at 23):

> The state of the case law leads us to but one conclusion. While many items have been held to be, or not to be, "machines," there is no "judicial determination" of what a machine is. *It remains simply a question of common meaning and each case must be decided on the basis of its own facts, technical and legislative.* [Emphasis added.]

Similarly, with respect to the term "structural shapes," as used in paragraph 312 of the Tariff Act of 1930,[6] our appellate court recognized that "[n]o precise definition, however, can be laid down to cover the term, each case depending on its own record for determination." *The Frost Railway Supply Co.* v. *United States,* 39 CCPA 90, 92–93, C.A.D. 469 (1951). Accord, *United States* v. *Humble Oil & Refining Co. et al.,* 46 CCPA 138, 140, C.A.D. 717 (1959); *United States* v. *The Winkler-Koch Engineering Co.,* 41 CCPA 121, 134, C.A.D. 540 (1953); *Universal Builders Supply Co., Inc.* v. *United States,* 48 Cust. Ct. 99, 104, C.D. 2319 (1962). Further, in *Winkler-Koch,* the Court of Customs and Patent Appeals pointed up (41 CCPA at 134):

> We think it would be impossible, under the phraseology adopted by the legislative branch of the Government in the Tariff Act of 1930, for the courts to lay down a rule and declare

---

[6] Prior to the tariff schedules, there was no tariff provision for "structures" per se.

that such rule settled the questions of what is and, therefore, what is not a structural shape within the meaning of paragraph 312, *supra.*

*Simon, Buhler & Baumann (Inc.)* v. *United States,* 8 Ct. Cust. Appls. 273, T.D. 37537 (1918) was the so-called pioneer case on the subject matter of "structural shapes."[7] In *Simon,* the ultimate issue—whether certain parts of a brewery mash filter were "structural shapes" under paragraph 104 of the Tariff Act of 1913—was approached by first determining whether the filter itself was a "structure." The *Simon* definition of the term "structure" was recently adverted to with approval in *United States* v. *Paul M. W. Bruckmann,* 65 CCPA 90, 93, C.A.D. 1211, 582 F. 2d 622 (1978), wherein Judge Baldwin commented:

> * * * A complete definition of "structural" or "structure" is not to be found. An adequate point of departure is found in *Simon, Buhler & Baumann (Inc.)* v. *United States,* 8 Ct. Cust. Appls. 273, 276, T.D. 37537 (1918), as follows:
>
>> Ordinarily speaking, "structure" carries with it the idea of size, weight, and strength, and it has come to mean anything composed of parts capable of resisting heavy weights or strains and artificially joined together for some special use.

In *United States* v. *Humble Oil & Refining Co., et al.,* 46 CCPA 138, 140, C.A.D. 717 (1959), we indicated "that the word 'structures,' is not limited to such erections as buildings, bridges, and edifices." In *Laurence Myers Scaffolding Co.* v. *United States,* 57 Cust. Ct. 333, 339, C.D. 2809, 259 F. Supp. 874, 879 (1966), "bridge overhang shores, highway shores, and building shores" were all found to serve a purpose similar to the articles mentioned in the TSUS item. Therefore, bridges and highways are considered to be statutory "structures." In *J. Ray McDermott & Co.* v. *United States,* 69 Cust. Ct. 197, C.D. 4394, 354 F. Supp. 280 (1972), an offshore oil well drilling platform was found to be a "structure."

In addition to the *Simon* definition of "structure," plaintiff cites the following definitions as an aid to the Court in determining the common meaning of the term:

1. Sutherland and Bowman, *"Structural Theory,"* (3d ed. 1942), page 3:
   A framed structure is an assembly of structural members arranged to carry the given load.
2. "Van Nostrand's Scientific Encyclopedia" (3d ed. 1958), page 1604:
   The grouping of the various parts of an assembled entity, and the points at which, or the means by which, they are held together.

---

[7] See *United States* v. *The Winkler-Koch Engineering Co.,* 41 CCPA 121, 127, C.A.D. 540 (1953).

3. "The American Heritage Dictionary of the English Language" (1970), page 1278:

1. A complex entity. 2.a. The configuration of elements, parts, or constituents in such an entity * * *.

4. "Black's Law Dictionary" (4th ed. 1951), page 1952:

Any construction, or any production or piece of work artificially built up or composed of parts joined together in some definite manner.

5. "The American College Dictionary" (1962), page 1200:

Anything composed of parts arranged together in some way * * *.

6. "Webster's Third New International Dictionary of the English Language Unabridged" (1971), page 2267:

2(b). something made up of more or less interdependent elements or parts; something having a definite or fixed pattern of organization.

The testimony offered by plaintiff accentuates the capacity of the shore frame systems to support heavy loads. Plainly, then, the shore frame systems, which are "composed of parts capable of resisting heavy weights or strains and artificially joined together for some special use," fall squarely within the meaning of "structure" as enunciated in *Simon*. Additionally, all the lexicographic definitions of "structure" cited by plaintiff encompass the shore frame systems. Consequently, there can be no doubt that the merchandise falls within the common understanding of the term "structure."

## Brussels Nomenclature

In addition to its reliance upon common meaning and judicial precedent, plaintiff cites the Brussels nomenclature as an indicium of legislative intent respecting the scope of the term "structures" in the superior heading to items 652.90–652.98, TSUS.

The master rule of statutory construction, of course, is to interpret the provision so as to carry out the legislative intent. *United States* v. *American Trucking Ass'ns.*, 310 U.S. 534, 542 (1940); *United States, etc.* v. *Simon Saw & Steel Co.*, 51 CCPA 33, at 40. It is well settled that the Brussels nomenclature may properly be referred to "as an aid to interpreting" provisions of the TSUS where there is a "close similarity in the wording" of the two provisions. *United States* v. *Abbey Rents*, 66 CCPA—, n.5, C.A.D. 1213, 585 F. 2d 501 (1978).[8] See also Sturm, "A Manual of Customs Law" (1974), pages 150–51, 195–96, and 1976 supplement at page 48.

---

[8] The U.S. Tariff Commission acknowledged that the Brussels nomenclature had great influence in the preparation of the tariff schedules. "Tariff Classification Study Submitting Report," at p. 8 (1960). See also: *Mattel, Inc.* v. *United States*, 65 Cust. Ct. 616, 625–27, C.D. 4147 (1970); *W. R. Filbin & Co., Inc.* v. *United States*, 63 Cust. Ct. 200, 208–10, C.D. 3897, 306 F. Supp. 440 (1969).

The language contained in the superior heading to items 652.90–652.98, TSUS, and in heading 73.21 of the Brussels nomenclature is:

Superior Heading, Items *652.90–652.98, TSUS*

Hangars and other buildings, bridges, bridge sections, lockgates, towers, lattice masts, roofs, roofing frameworks, door and window frames, shutters, balustrades, columns, pillars and posts, and other structures and parts of structures, all the foregoing, of base metal:

Heading 73.21, *Brussels Nomenclature*

*Structures*, complete or incomplete, whether or not assembled, *and parts of structures*, (for example, *hangars and other buildings, bridges and bridge-sections, lock-gates, towers, lattice masts, roofs, roofing frameworks, door and window frames, shutters, balustrades, pillars and columns*), *of iron or steel*; plates, strip, rods, angles, shapes, sections, tubes and the like, prepared for use in structures, of iron or steel. [Emphasis added.]

As was previously mentioned, the court noted in *SGB I* that heading 73.21 of the Brussels nomenclature and the superior heading to items 652.90–652.98, TSUS, utilize "substantially similar language." Conceding that "it is apparent that the 'structures' and certain 'parts of structures' provisions in the TSUS were substantially derived from the Brussels nomenclature," defendant nonetheless insists that "the two provisions in question were not intended to be coextensive in coverage, and the differences in the two provisions are critical when applied to shore frame systems * * *" (brief, at 41–42). I disagree.

In light of the obviously similar phraseology in Brussels heading 73.21 and the superior heading to items 652.90–652.98, TSUS, affecting structures and parts of structures, and the fact that there was no specific provision for "structures and parts of structures" in the Tariff Act of 1930, it is beyond peradventure that the TSUS superior heading was derived from the Brussels nomenclature. Clearly, then, the Brussels nomenclature is part of the legislative history of the superior heading, and is a source for determining the intended scope of the term "structures" in that heading.

The court also noted in *SGB I* (70 Cust. Ct. at 165) that "substantially similar language [to the superior heading] in heading 73.21 of the Brussels nomenclature is intended to encompass adjustable or telescopic props and similar equipment for use in scaffolding." (Explanatory notes, vol. 2, p. 674.) Since scaffolding is regarded as a "structure" under Brussels heading 73.21,[9] it is certainly reasonable

---

[9] Scaffolding is commonly regarded as a "structure." For example, "The Random House Dictionary of the English Language" (unabridged ed. 1969) defines the term "scaffold" as: "A temporary structure for holding workmen and materials during the erection, repair, or decoration of a building." Additionally, the New York State Industrial Code rule for "Protection in Construction, Demolition and Excavation operations" (12 NYCRR 23) (defendant's exhibit G) defines the term "scaffold" as: "A temporary elevated working platform and its supporting structure including all components."

to assume that "scaffold-type shoring," such as that involved here, was intended by the drafters of the tariff schedules to be embraced by the corresponding provision for "structures" in the superior heading to item 652.98, TSUS. Cf. *Robert Bosch Corp. et al.* v. *United States*, 63 Cust. Ct. 187, 192, C.D. 3895, 305 F. Supp. 921 (1969).

As previously mentioned, defendant's witness Meyer admitted on cross-examination that the imports are similar to the scaffold-type shoring depicted on page 68 of the Hurd text, "Formwork for Concrete" (plaintiff's exhibit 3–A) (R. 170–71). More, "shoring," as defined in defendant's exhibit I (Hurd text, p. 315) includes "scaffold-type frames" (R. 154); and conversely, "scaffolding" may be used as shoring for concrete forms. Encyclopaedia Britannica ((1970), vol. 19, p. 1132). Finally, the record shows that the shore frame systems, in addition to their use for supporting concrete formwork, were used as scaffolding to support men and materials (R. 9, 58–59).[10]

In short, the instant merchandise is classifiable under the provision for "structures * * * and parts of structures" in heading 73.21 of the Brussels nomenclature, and accordingly falls within the intended scope of the identical language in the superior heading to item 652.98, TSUS.

### Ejusdem Generis

We now consider defendant's argument that the legislative intent respecting the scope of the term "structures" is in doubt, and therefore it is necessary to resort to the rule of *ejusdem generis*.

In essence, the *ejusdem generis* rule is applied where particular words of description are followed by general terms, and the latter are regarded as referring to things of a like class with those particularly described. And in *Sandoz Chemical Works, Inc.* v. *United States*, 50 CCPA 31, 35, C.A.D. 815 (1963), the Court of Customs and Patent Appeals, per Judge Almond, said:

> *Ejusdem generis* is a rule of construction invoked, where legislative intention is in doubt or beclouded by ambiguity, as an aid in ascertaining the intention of the legislature. *It is not invoked to narrow, limit or circumscribe an enactment and never invoked if the intention of the legislature can be ascertained without resort thereto.* [Emphasis added.]

The thrust of defendant's argument is that the shore frame systems are not *ejusdem generis* with the exemplar structures in the superior heading because the systems are not permanently affixed, but rather are used as construction equipment for the temporary support of concrete formwork. Additionally, defendant cites many of the differences

---

[10] Plaintiff's witness Heiner testified that "there is probably more of this [shore frame system] used to support men and materials than there is for forms" (R. 66). However, its witness O'Callaghan stated that the primary use of the merchandise was to support concrete (R. 16).

in physical characteristics and design features between buildings and the shore frame systems.

Were it necessary to resort to the rule of *ejusdem generis* in this case (and I conclude that it is not), it is apparent from the wide diversity of structures enumerated in the statute (viz, hangars and other buildings, bridges, lock-gates, towers, and lattice masts) that the rule must be liberally applied and embraces the instant merchandise. Cf. *United States* v. *S. P. Skinner Co., Inc.*, 46 CCPA 105, C.A.D. 708 (1959); *Seprol, Inc., et al.* v. *United States*, 48 Cust. Ct. 480, Abs. 66856 (1962). Also cf. *United States* v. *C. J. Tower & Sons*, 44 CCPA 1, C.A.D. 626 (1956); *Norman G. Jensen, Inc.* v. *United States*, 47 Cust. Ct. 149, C.D. 2295 (1961).

Moreover, it should be noted that "towers" are one of the exemplars specifically named in the statute. As stated in plaintiff's exhibit 3–B, "[s]caffold-type shoring is generally assembled in *tower structures* consisting of a pair of prefabricated frames, plus the diagonal cross bracing required to make the *tower*." (Emphasis added.) Plaintiff's exhibit 3–A, depicts a "typical shoring 'tower'" (illustration 4–58):

As we have seen, defendant's witness Meyer admitted that the imports are similar to the scaffold-type shoring towers depicted above. In view of the foregoing admission, there is no merit in defendant's contention that the shore frame systems are not *ejusdem generis* with the exemplar structures in the superior heading (which includes towers).

But whether or not the merchandise is *ejusdem generis* with the exemplars enumerated in the statute, I find the rule inapplicable here.

In *United States* v. *The Winkler-Koch Engineering Co.*, *supra*, the question presented was whether certain oil well casings were "structural shapes" within the purview of paragraph 312 of the Tariff Act of 1930. The Government argued that the rule of *ejusdem generis* was applicable to the designation in paragraph 312, namely, "all other structural shapes of iron or steel," and that the oil well casings were not of the same general class as the articles named in the paragraph.

In rejecting the Government's narrow interpretation of the language "other structural shapes," predicated upon the *ejusdem generis* rule, our appellate court articulated the following rationale (41 CCPA at 134):

> * * * Conceding, without holding, that the casings here involved are not *ejusdem generis* with "beams, girders, joists, angles, channels, car-truck channels, tees, columns, and posts, or parts or sections of columns and posts, and deck and bulb beams," all of which are embraced within the term "structural shapes," we may not overlook the fact that Congress realized that there were and are "other structural shapes" of iron and steel and that it made provision for them. We do not have to go outside the paragraph to ascertain that "other structural shapes" are as fully provided for in paragraph 312 of the Tariff Act of 1930 as are beams, girders, or any other of the several articles designated *eo nomine* therein, but it is frequently more difficult to determine what constitutes a structural shape than it is to determine what constitutes a girder or a tee. The courts have fully recognized this in decisions from which quotations have been made herein, the latest being from *The Frost Railway Supply Co.* case, *supra*, where we said, "*No precise definition,* * * * *can be laid down to cover the term* [structural shapes], *each case depending on its own record for determination.*" [Emphasis in original.]

The teaching of *Winkler-Koch*, therefore, is that under paragraph 312 an article was not excluded from classification under the catch-all language "other structural shapes" by reason of the rule of *ejusdem generis,* and "*each case depend*[*ed*] *on its own record for determination.*" See also *United States* v. *Humble Oil & Refining Co.*, *supra*, wherein the Court of Customs and Patent Appeals applied much the same rationale. Although the TSUS provision here under consideration is "other structures" rather than "other structural shapes," as in paragraph 312, the court's approach in *Winkler-Koch* eschewing the rule of *ejusdem generis* is fully apposite in the present case.

I find defendant's argument that a "structure" includes only articles permanently affixed to be unpersuasive. It must be recognized that a criterion of permanence was consistently rejected under the provision for structural shapes in prior tariff acts. *Rex-Spannal, Inc.* v. *United States*, 60 Cust. Ct. 141, C.D. 3291 (1968) (shores); *Universal Builders Supply Co., Inc.* v. *United States*, *supra* (lattice form supports and

solid form supports used in concrete construction). See also *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T.D. 42184 (1927), wherein the court held that steel sheet piling used in concrete construction was classifiable as structural shapes even though at times its use was of a temporary nature. Similarly, a criterion of permanence is inapplicable here respecting the provision for "structures" in the TSUS.[11]

Parenthetically, there is a further reason which warrants rejection of defendant's narrow interpretation of the term "structures." One of the major objectives of the drafters of the tariff schedules was to deemphasize the importance and restrict the scope of "basket" provisions. "Tariff Classification Study Submitting Report" (1960), part II(E)(4), at 15–16; *United States* v. *A. Johnson & Co., Inc.*, 66 CCPA—, C.A.D. 1218, 588 F. 2d 297 (1978); *American Express Co.* v. *United States*, 61 Cust. Ct. 208, 213, C.D. 3573, 290 F. Supp. 778 (1968), *aff'd*, 57 CCPA 100, C.A.D. 985, 426 F. 2d 383 (1970). If we were to adopt the construction advanced by defendant, the classification of the merchandise would, of course, be relegated to item 657.20, the basket provision in schedule 6 of the tariff schedules for metal articles. Consequently, adoption of defendant's highly restrictive interpretation of the term "structures" would serve to defeat a major objective of the tariff schedules.[12]

## Conclusion

For all the reasons stated herein, and under all the facts and circumstances, plaintiff's claim that the shore frame systems and parts thereof are properly dutiable under item 652.98, TSUS, is sustained, except with respect to the merchandise covered by entry No. 508229. The protest covering that entry (protest No. 1001–1–020722 in court No. 72–2–00394) is untimely under 19 U.S.C. 1514(b), having been filed more than 90 days after liquidation of the entry. Accordingly, this consolidated action is dismissed *sua sponte* for lack of jurisdiction only as to entry No. 508229. Judgment will be entered accordingly.

---

[11] Interestingly, the Customs Service has ruled that a temporary warehouse is classifiable under the provision for "Other structures and parts of structures" in item 652.98, TSUS. 4 Cust. Bull. 118, T.D. 70-54(12) (1970).

[12] The predecessor to item 657.20, TSUS, was par. 397 of the Tariff Act of 1930. As significantly pointed out recently by Judge Rich in *A. Johnson & Co., Inc., supra*, par. 397 "had come to incorporate such a hodgepodge of tariff classifications that it took no less than 219 separate TSUS item descriptions to sort them out." 66 CCPA at—, n.8.